(No. 62144

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LEROY ORANGE, Appellant.

*Opinion filed February 11, 1988.—Rehearing denied April 5, 1988.*

366

368

SIMON, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Robert E. Davison, and Beth Katz, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, and Karen McNaught, law student, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago

(Mark L. Rotert and Terence M. Madsen, Assistant Attorneys General, of Chicago, Thomas V. Gainer, Jr., and Kevin Sweeney, Assistant State's Attorneys, and Renee G. Goldfarb, Special Assistant State's Attorney, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, Leroy Orange, was convicted in a jury trial in the circuit court of Cook County on charges of murder, concealment of a homicidal death, and aggravated arson. The defendant waived his right to a jury for purposes of a death penalty hearing, and the trial judge sentenced the defendant to death. The defendant's execution was stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d Rules 603, 609(a).

The offenses in question occurred at an apartment building located at 1553 West 91st Street in Chicago on January 12, 1984. Responding to a report of a fire, authorities arrived at the scene around 6:30 that morning and discovered the bodies of four persons in a third-floor apartment in the building. The victims were three adults—Rene Coleman, Michelle Jointer, and Ricardo Pedro—and a child, Coleman's 10-year-old son, Anthony. All four persons had been stabbed repeatedly and had died from those wounds. The defendant, who was an acquaintance of the victims, and his brother, Leonard Kidd, were arrested later that day in connection with the offenses. The defendant made a series of incriminating statements to the police, culminating in a signed confession to the crimes.

The defendant does not challenge the sufficiency of the evidence of his guilt, and that evidence may be summarized briefly. According to the defendant's statement, during the evening of January 11, 1984, he and Rene

Coleman went to meet Leonard Kidd to ask about using Kidd's combination radio and tape player to exchange for some cocaine. Kidd agreed to the plan, and the defendant and Coleman then returned to her apartment with the appliance. Michelle Jointer, Ricardo Pedro, and Coleman's son were present at that time. After smoking some cocaine, the defendant called his brother at 12:30 or 1 o'clock that morning and asked him to come to the apartment; when Kidd arrived, the defendant explained that he was having some problems with Ricardo Pedro. In the statement, the defendant said that around 3:30 he got into a fight with Pedro and stabbed him and then tied him up, leaving him in the back bedroom of the apartment. Following that, the defendant went to another part of the apartment and consumed more cocaine. The defendant said that he returned to the back bedroom around 5:30 and stabbed Pedro again. The other victims were also in the bedroom at that time, and the defendant tied up Jointer, and attempted to tie up Coleman's son; Coleman, however, insisted on doing that herself, and when she was done, the defendant tied her up also. The defendant said that he gagged Jointer and the Colemans and then stabbed them. The defendant set the bed on fire and started another fire in the front of the apartment. The defendant and Kidd then left the apartment together; Kidd took with him the combination radio and tape player. The defendant said that he disposed of some knives and his cocaine pipe in garbage cans in the vicinity and that he burned some of his clothing.

The defendant testified at trial, and he denied any involvement in the crimes. The defendant's account at trial of the activity preceding his brother's arrival at the apartment corresponded in large part to what the defendant had told the police concerning that period. In his testimony, however, the defendant said that he left the apartment around 2:30 a.m., when he went to the

home of friend, Shirley Evans, where he stayed until 8 o'clock that morning. The defendant also testified that the police mistreated him while he was in custody, and he attributed his confession to the alleged abuse. Shirley Evans testified in the defendant's behalf as an alibi witness, and she corroborated the defendant's account of his visit to her home. She explained that the defendant had come over to pick up an employment application from the place where she worked. They talked for several hours, and then he left.

Also testifying in the defendant's behalf at trial was Leonard Kidd. Kidd said that the defendant left the Coleman apartment at 2:30 that morning. Kidd testified that it was he who had committed the murders and set the fires in the apartment. He explained that he got into a fight with Ricardo Pedro over the combination radio and tape player and stabbed Pedro and that, several hours later, after consuming more drugs, he stabbed the other victims. Kidd denied that the defendant took any part in the offenses.

In rebuttal, the State introduced the testimony of the police officers who had taken part in the investigation of the offenses and the interrogation of the defendant; they denied that any mistreatment had occurred. The State also published to the jury the statement that Kidd had given to the police; it was generally consistent with what the defendant had said in his confession. Also testifying as a rebuttal witness for the State was Dr. Shirish Parikh, who had examined the defendant at the county jail medical facility on January 14, 1984, two days after the defendant's arrest. According to Dr. Parikh, the defendant's complaints were that police officers had stuck needles in his back or buttocks and had squeezed his testicles; however, Dr. Parikh testified that he found no evidence of mistreatment.

At the conclusion of the trial, the jury returned verdicts finding the defendant guilty on four counts each of murder and concealment of a homicidal death, in connection with the deaths of the Colemans, Jointer, and Pedro, and guilty on one count of aggravated arson. The defendant was also charged with the armed robbery of Ricardo Pedro, but the jury acquitted him of that offense.

I

As a preliminary matter, we note the State's argument that several of the contentions made by the defendant in this appeal may be considered waived because defense counsel failed to raise them in the post-trial motion filed in this case. (See *People v. Szabo* (1986), 113 Ill. 2d 83, 93-94; *People v. Caballero* (1984), 102 Ill. 2d 23, 31-33.) "The waiver rule is one of administrative convenience rather than jurisdiction" (*People v. Smith* (1985), 106 Ill. 2d 327, 333), and we do not believe that it should be applied here. In this case, defense counsel filed a post-trial motion following the sentencing hearing, raising some 16 allegations of error. At the hearing on the post-trial motion, the defendant said that he was dissatisfied with the motion and that he believed that additional matters should have been asserted. In response, the trial judge suggested that a contemporaneous objection by counsel was all that was necessary to preserve an issue for review and that, once objected to, a matter did not have to be realleged in the post-trial motion. The trial judge also said, however, that he would allow the defendant an additional week in which to file a supplemental motion and indicated that he was going to appoint counsel for that purpose. No additional post-trial motion was filed. Because the defendant may have failed to file a supplemental motion in light of the court's remarks suggesting that a contemporaneous objection was,

by itself, sufficient to preserve an issue for review, we do not believe that it would be appropriate in this case to consider as waived objected-to matters that were not realleged in the post-trial motion.

## A

The defendant first argues that he was denied a fair trial because the State suggested, in cross-examination and closing argument, that Leonard Kidd had fabricated his trial testimony in collusion with defense counsel.

During cross-examination, the prosecutor elicited from Kidd the information that he had originally been represented in this matter by defense counsel, Earl Washington. The prosecutor later asked Kidd whether he had ever discussed his testimony with Washington; when Kidd replied that he had not, the prosecutor asked, "This is a complete surprise to Mr. Washington. Is that correct?" Defense counsel's objection was overruled, and Kidd responded, "That's correct."

We do not believe that the State's cross-examination may be interpreted as an attack on defense counsel. Kidd maintained that he had not previously related his trial testimony to anyone, and in cross-examination, the prosecution was warranted in asking Kidd whether defense counsel had originally represented him and whether he had ever discussed the testimony with counsel.

The defendant also complains of certain remarks made by the prosecution in closing argument. In closing argument, the prosecutor described the defense strategy in this case as "the frick and frack [d]efense. Leonard comes in and testifies for Orange, and then they hope that some day in the future Mr. Orange, after he is out of here, comes in and testifies for Mr. Kidd. Don't let him do that." Defense counsel's objection was overruled. Later, after noting that the pretrial statements made by

Kidd and the defendant were consistent, the prosecutor said, "When is the next time that Leonard Kidd and Leroy Orange are consistent in their stories? When they testify, after they have talked to Mr. Washington and another attorney in the County Jail. And that's when Leonard Kidd told you that Mr. Washington would be surprised, surprised by his testimony. Absurd." Defense counsel did not make any objection to the remark.

We do not believe that the first remark complained of may be fairly interpreted as an attack on defense counsel. That "they" were engaging in the "frick and frack defense" obviously referred to the defendant and Kidd, not to defense counsel. With respect to the second remark, we note that defense counsel did not object to it. Immediately after making the statement, the prosecutor invited the jurors to consider the demeanor of the witnesses, and referred to the defendant, who had testified, as a "macho-egotist." At that point defense counsel made a request to argue "motions" at the conclusion of the State's argument, and at the end of argument, counsel did not complain of the remark contested here. Moreover, defense counsel himself had brought out, on redirect examination, that he and Kidd's counsel had met with Kidd and the defendant in the county jail before trial. In conclusion, we do not believe that the jurors in this case would have construed the cross-examination and argument complained of as an attempt to impugn the integrity of defense counsel. *Cf. People v. Bean* (1985), 109 Ill. 2d 80; *People v. Emerson* (1983), 97 Ill. 2d 487.

The defendant also complains of certain remarks concerning Kidd's credibility that were made by the State in rebuttal argument at trial. The prosecutor mentioned that Kidd had not pleaded guilty to the offenses here. The prosecutor also argued that Kidd's testimony was less than fully self-incriminating, contending that Kidd's

description of the events leading up to his initial attack on Ricardo Pedro could support a claim of self-defense (see Ill. Rev. Stat. 1983, ch. 38, par. 7—1), and that Kidd's account of his attack on the three remaining victims could sustain a defense of intoxicated or drugged condition (see Ill. Rev. Stat. 1983, ch. 38, par. 6—3). The trial judge overruled defense counsel's objections to those remarks. The defendant argues here that Kidd's failure to plead guilty to the offenses was irrelevant and that the prosecutor misstated the facts and the applicable law when he asserted that Kidd had attempted to hedge his admissions of guilt.

The State's argument in rebuttal was warranted by the evidence in this case. Defense counsel recognized that Kidd's credibility depended in part on how self-incriminating his testimony was. In his closing argument to the jurors, defense counsel argued that Kidd was a believable witness "[b]ecause when he got on the stand and confessed to these murders and told you that that man [i.e., the defendant] had nothing to do with it, he had nothing to gain; absolutely nothing to gain. Look at what he forfeited. He did it here publicly, under oath. And as a jury, I ask you to give it every consideration, because there is no reason, none that anyone can logically conceive why he would lie. When he goes to that stand, he gives all. And there is no road back. He gives it all." In response to defense counsel's argument, the prosecutor made the remarks at issue here, and the trial judge overruled the defense objection to them. Although Kidd's trial testimony in this case was obviously damaging to his own cause, the prosecutor was warranted in arguing that Kidd had not yet pleaded guilty to the offenses and that his account of the events could support a claim of self-defense or a denial of criminal responsibility. Kidd testified that the charges against him were still pending at the time of his testimony. Kidd said that his

initial attack on Ricardo Pedro occurred when Pedro threatened him with a knife. Also, Kidd testified, "I didn't intend to kill nobody. I never did hurt nobody. I didn't know what I was doing. We never had the drugs I had that night. I didn't know what to do." The trial judge's ruling was proper. The prosecutor's argument was proper, and the remarks did not misstate the evidence.

## B

The defendant next argues that the trial judge erred in limiting certain efforts made by defense counsel to rehabilitate defense witness Kidd following the State's cross-examination. First, during redirect examination of Kidd, the following occurred:

"Q. Now, [the prosecutor] asked you if you had told Mr. Dernbach [i.e., the assistant State's Attorney who conducted the custodial interrogation] that Leroy Orange had done all of these different things. You did tell him that, didn't you?

A. Yes, sir.

Q. Why did you tell Mr. Dernbach that?

MR. KAPLAN: Objection.

THE COURT: Sustained.

Q. [MR. WASHINGTON]: At the time that you made the statement to Mr. Dernbach and to the police, were you trying to put the blame on Mr. Orange?

A. Yes, sir."

The defendant argues here that Kidd was entitled to answer the next-to-the-last question quoted above to explain why he had made the earlier statement and that the trial judge improperly restricted that evidence.

We agree with the defendant that the trial judge erred in sustaining the State's objection to the question, for counsel may, in attempting to rehabilitate a witness who has been impeached with a prior inconsistent statement, ask the witness to explain his reasons for giving

the earlier statement. (*People v. Hicks* (1963), 28 Ill. 2d 457, 462; *People v. Frugoli* (1929), 334 Ill. 324, 335-37; *People v. Hanson* (1980), 83 Ill. App. 3d 1108, 1114.) We believe that the error was harmless, however. Immediately after the objection was sustained, defense counsel asked Kidd whether he had been "trying to put the blame on" the defendant during the custodial interrogation, and Kidd responded affirmatively, repeating what he had said on direct examination. By rephrasing the question to which an objection had been sustained, defense counsel received the answer that he was seeking.

The defendant next complains that the trial judge erred in barring an attempt by defense counsel to question Kidd regarding counsel's withdrawal from representation. This came up in the following part of the redirect examination:

"Q. At one point I was representing you and Mr. Orange, is that correct?

A. Yes, sir.

Q. And I withdrew from your representation at one point here in this Court, did I not?

A. Yes, sir.

Q. And I explained to you that there was a conflict.

MR. KAPLAN: Objection.

THE COURT: Sustain the objection."

At a sidebar conference, the trial judge explained that he believed that counsel was beginning to go into matters protected by the attorney/client privilege, which Kidd had not waived. After a discussion, which included a refusal by the trial judge to permit counsel to make an offer of proof on the matter because the judge did not believe that it was necessary, defense counsel said, "I think the only thing that I am trying to do is to explain that I withdrew from his representation because of the conflict between the two Defendants. I think that is entirely proper. Beyond that, nothing." In reply, the trial

judge cautioned counsel on the questioning of the witness; counsel then asked whether the judge meant that he could not "go into the area opened up by the State about the fact that I represented this witness at some time?" The trial judge replied, "Mr. Washington, I have never said that. I have never even inferred that. I have not raised any points on what you have done. I am raising points on what can happen and what can develop by further going into this particular approach." Counsel then resumed his redirect examination of the witness, and, in further questioning, Kidd acknowledged that defense counsel had not represented him for about a year. The trial judge sustained an objection to the next question, whether Kidd was currently represented by a named attorney; Kidd then testified, without objection, that he was currently represented by counsel.

The trial judge was correct in sustaining the objection to the question regarding the conflict in representation. Counsel's reasons for withdrawing from representation were within the attorney/client privilege. But the trial judge did not preclude defense counsel from showing that he no longer represented Kidd, and from our review of the record, we believe that defense counsel was in fact allowed to make the inquiry he desired.

Later, defense counsel attempted to question Kidd about a letter written by him that was consistent with his testimony at trial. The trial judge again believed that the letter's admission would violate the attorney/client privilege and, moreover, that the letter was hearsay and was outside the scope of cross-examination.

The State argues that the letter failed to satisfy the rule governing the admission of prior consistent statements, and we agree. In *People v. Clark* (1972), 52 Ill. 2d 374, 389, the court explained, "[T]o rebut a charge or an inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication, evi-

dence is admissible that he told the same story before the motive came into existence or before the time of the alleged fabrication." Here, Kidd testified that in August 1984, after speaking with his mother and grandmother, he decided to reveal the version of events that he related at trial, which, he insisted, was the truth about the matter. The letter would have simply corroborated Kidd's description of the time of his change of heart, and the State did not dispute that a change occurred. In these circumstances, the letter had little relevance, and we do not believe that the trial judge erred in denying its admission.

C

Here, the State made substantive use of Kidd's confession to the police as a prior statement inconsistent with his trial testimony. (See Ill. Rev. Stat., 1984 Supp., ch. 38, par. 115—10.1.) The State published the confession to the jury during the presentation of rebuttal evidence, at the conclusion of the direct and cross-examination of the assistant State's Attorney who had taken the statement, Dennis Dernbach. Following that, defense counsel sought leave to cross-examine Dernbach further on several aspects of the statement, but the trial judge refused to permit the inquiry. The trial judge also denied defense counsel's request to recall Kidd to examine him regarding the circumstances surrounding the making of the confession. The defendant now argues that the trial court's rulings improperly restricted his right to present a defense and to confront the witnesses against him. Also, the defendant contends that Kidd's August 1984 letter became admissible once his confession to the police was given substantive value.

The defendant argues that counsel should have been permitted to conduct further cross-examination of Assistant State's Attorney Dernbach, after both sides had

questioned the witness and he had published Kidd's statement to the jury. It appears from the record that Dernbach was still in the courtroom when defense counsel made his request. Counsel did not point to any particular matter that he wished to make a more complete record of, and there is nothing in the record to indicate that the court's refusal could have prejudiced the defendant.

During cross-examination Kidd was asked about his pretrial statement to the police, and its substantive use became clear at that point. The proper procedure was for defense counsel to make the desired inquiry on redirect examination. Addressing the substantive use of prior inconsistent statements, one commentator has noted, "[I]f a full foundation is provided—*i.e.*, if the questioning covers the time, place, persons present, and content of the prior statement ***—an opportunity is obviously provided to opposing counsel to explore the prior inconsistent statement on redirect and to bring out any explanation the witness may have." (Graham, *Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence 801(d)(1)(A), 613, and 607*, 75 Mich. L. Rev. 1565, 1605 (1977).) Accordingly, defense counsel's opportunity for questioning Kidd about the confession came during redirect examination. At that time, counsel asked Kidd about the statement, and elicited from him the explanation that he had been trying to put the blame on the defendant. It is not clear from the record here what additional information Kidd could have provided, had the court granted defense counsel's request to recall Kidd. Counsel told the trial judge, "I haven't spoken to him about this so I can't tell you everything he would say, but I would like to cover some of the areas that were covered in his statement." The court denied the request, correctly believing that

counsel had had "ample opportunity" to make that inquiry.

We must also reject the defendant's additional argument that, once the confession was introduced as substantive evidence, the August 1984 letter became admissible as a prior statement inconsistent with it. To be admissible as substantive evidence under the statute, the prior statement must be inconsistent with the witness' trial testimony. (Ill. Rev. Stat., 1984 Supp., ch. 38, par. 115—10.1(a).) Here, the letter was consistent with Kidd's trial testimony, and therefore it did not come within the scope of the provision.

The defendant also attacks the constitutionality of the statute authorizing the substantive use of prior inconsistent statements, section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat., 1984 Supp., ch. 38, par. 115—10.1) on the ground that the provision trenches on the rulemaking authority of this court and therefore violates the separation of powers clause of the Illinois Constitution (Ill. Const. 1970, art. II, §1; see *People v. Joseph* (1986), 113 Ill. 2d 36). At no time in the proceedings in the circuit court, however, did the defendant challenge the constitutionality of the statute, and therefore the argument may be considered waived. (*People v. Dale* (1986), 112 Ill. 2d 460, 466-67.) Moreover, the defendant's argument must fail, for the statute was clearly within the legislature's authority. (See *People v. Rolfingsmeyer* (1984), 101 Ill. 2d 137, 140 ("[I]t is clear that 'the legislature of a State has the power to prescribe new and alter existing rules of evidence or to prescribe methods of proof.' " (quoting *People v. Wells* (1942), 380 Ill. 347, 354)).) That this court has previously refused to allow the substantive use of prior inconsistent statements (see *People v. Collins* (1971), 49 Ill. 2d 179) did not preclude the legislature from doing so.

## D

The defendant next argues that the trial judge erred in restricting counsel's presentation of evidence that, in the defendant's view, supported Kidd's testimony that the defendant was not with him when the offenses were committed. The testimony in question was that of defense witness James Thomas, a Chicago firefighter. Thomas testified that while he was engaged in putting out the fire at the apartment building, a man approached him and asked whether the bodies had been burned. Thomas told the person that the bodies had not burned, and the person then said "Damn" and walked away. Thomas testified that a day or two later he saw a newspaper story about the fire; accompanying the story were photographs of two men, and Thomas said that he recognized one of the men as the person who had asked him about the condition of the victims' bodies. When the trial judge did not allow the witness to provide the identification given by the newspaper, defense counsel requested permission to bring Kidd into the courtroom for an in-court identification by Thomas, to establish that it was Kidd whom Thomas had seen at the fire. The trial judge denied counsel's request, believing that the procedure would be too time consuming, but he did say that counsel could recall the witness later; the trial judge also suggested that a properly authenticated photograph could have been used as the basis for identification. With that, defense counsel suspended his direct examination of Thomas, and the trial judge admonished the witness not to discuss the case with counsel in the meantime.

At the resumption of defense counsel's direct examination of Thomas, the witness selected from two photographs one that he said was the person whom he had seen at the fire. On cross-examination, Thomas testified that the photograph he selected resembled the man he

had seen and that he could not say "if it was definitely the man or not."

Even if we assume that the trial judge improperly restricted counsel's efforts to have Thomas identify Kidd as the person at the fire scene, we do not believe that the error was prejudicial. Contrary to the defendant's theory, we do not believe that evidence that Kidd was the person who had spoken with firefighter Thomas would have tended to show that Kidd was at the scene alone. Moreover, the firefighter's testimony would have been essentially cumulative. Both Kidd's trial testimony and his pretrial statement to the police showed that he remained at the apartment building until sometime after six o'clock that morning; because of his admitted responsibility for the offenses, he would have been motivated to make the inquiry and response described by Thomas whether he had acted as a lone principal or as an accomplice.

## E

The defendant also complains of certain rebuttal testimony given by his estranged wife, Mildred Orange. Mrs. Orange testified to a conversation she had had with the defendant in the Cook County jail in June 1984 while he was awaiting trial on the charges here. According to Mrs. Orange, the defendant said that one of his girlfriends, Deidre Irvin, was going to testify in his behalf as an alibi witness. In fact, Irvin did not testify at trial, and an alibi was provided by another friend, Shirley Evans. The defendant argues here that Mrs. Orange's testimony was not proper rebuttal because it did not contradict any of the defendant's own testimony and, further, that the introduction of their conversation into evidence violated his marital privilege. Defense counsel did not object to Mrs. Orange's testimony on either

ground, and therefore the defendant makes the additional argument that counsel was ineffective.

On cross-examination the defendant was asked, "Did Deidre [Irvin] also agree to come into court for you?" The defendant replied, "No." In rebuttal, Mrs. Orange testified that the defendant told her "that Deidre was going to say that he was with her the night of the murder." Later, defense counsel asked Mrs. Orange, "And on that occasion, your husband told you that the young woman [*i.e.*, Irvin] was going to testify for him, is that what you are saying?" Mrs. Orange replied, "Yes." Mrs. Orange's testimony contradicted that of the defendant on this point, and therefore it was proper rebuttal.

The defendant also argues that the introduction of Mrs. Orange's testimony regarding her conversation with the defendant in the county jail was in violation of the marital privilege applicable to criminal proceedings. (See *People v. Fritz* (1981), 84 Ill. 2d 72; Ill. Rev. Stat. 1983, ch. 38, par. 155—1.) It is not clear from Mrs. Orange's testimony whether she and the defendant were alone when they had the conversation in question; there is some indication from the defendant's own testimony on surrebuttal that the potential alibi witness, Irvin, was in fact present at that time. If that were the case, then the defendant could not have invoked the marital privilege with respect to the conversation, for the privilege protects only confidential communications (*People v. Sanders* (1983), 99 Ill. 2d 262; *People v. Simpson* (1977), 68 Ill. 2d 276).

In any event, the marital privilege was waived by the defendant's failure to invoke it when his wife testified. (See *Sanders*, 99 Ill. 2d at 272.) Contrary to the defendant's argument, we do not believe that counsel's failure to object to Mrs. Orange's testimony on that ground constituted ineffective assistance. "To obtain a new trial, a defendant who asserts that he was denied the effective

assistance of counsel must show both a deficiency in counsel's performance and prejudice resulting from that. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504.)" (*People v. Weir* (1986), 111 Ill. 2d 334, 337.) Assuming that counsel's failure to invoke the privilege was a deficiency in performance and not warranted as a matter of trial strategy, we find here no indication of actual prejudice from the waiver. The evidence of the defendant's guilt was strong, resting on the defendant's own confession as well as the pretrial statement of his brother, Kidd. We conclude, therefore, that the defendant was not denied the effective assistance of counsel by the failure to invoke the marital privilege.

### F

The defendant next complains of a limitation imposed by the trial judge on defense counsel in his cross-examination of one of the State's rebuttal witnesses, Dr. Shirish Parikh. Dr. Parikh testified about his examination of the defendant at the Cook County jail's medical facility on January 14, 1984, two days after the defendant was taken into custody. On cross-examination, defense counsel attempted to inquire into Dr. Parikh's use of what was termed a "bruise sheet," a two-page report that had been prepared by a paramedic prior to Dr. Parikh's examination of the defendant. The trial judge permitted several questions on the report, but he would not allow defense counsel to introduce it into evidence.

The defendant does not dispute here that counsel, in failing to offer the testimony of the paramedic who had prepared the report, failed to provide the necessary foundation for its admission. (See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 192; see also 107 Ill. 2d R. 236.) The defendant disclaims any substantive use of the contents of the report, however, and instead argues that

counsel was attempting to use it as evidence of Dr. Parikh's "state of mind" at the time of his examination of the defendant. Defense counsel was obviously attempting to show that the paramedic believed there was greater evidence of injury to the defendant than what Dr. Parikh saw, and the report was hearsay and inadmissible for that purpose.

Finding no reversible error in the conduct of the trial, we affirm the defendant's convictions for the offenses of murder and concealment of a homicidal death. The defendant's conviction for aggravated arson is discussed separately, below.

## II

Following the defendant's convictions for the offenses here, the State requested a hearing to determine whether the defendant should be sentenced to death. The defendant waived his right to a jury for that purpose, and the death penalty hearing was conducted on May 29, 1985. With respect to the defendant's eligibility for the death sentence, the parties stipulated that the defendant, who was born in 1951, was over 18 years of age at the time of the offenses here, that he had been convicted of murdering four persons, and that one of the murder victims, Anthony Coleman, was 10 years old at the time of death. As evidence in aggravation, the State established juvenile adjudications for theft and burglary, and an adult conviction in 1968 for criminal damage to property. Defense counsel did not present any mitigating evidence at the sentencing hearing; counsel maintained, however, that the defendant did not have a significant criminal history. At the conclusion of the hearing, the trial judge found that the defendant had been convicted of the murders of four persons and, further, that one of the victims was under 12 years of age and was murdered in an exceptionally brutal and heinous manner.

Those findings were sufficient to establish the defendant's eligibility for the death sentence under two separate statutory aggravating circumstances. (See Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(b)(3), (b)(7).) At the hearing, the trial judge further found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty, and he therefore sentenced the defendant to death for the murder convictions.

A

The defendant first argues that a new sentencing hearing is necessary because his juvenile adjudications were not admissible as aggravating evidence. Defense counsel did not object to the introduction of that evidence, and the defendant makes the additional argument that counsel's failure to object constituted ineffective assistance under *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and *People v. Albanese* (1984), 104 Ill. 2d 504.

In arguing against the admissibility of his juvenile adjudications at the death penalty hearing, the defendant relies on section 2—10(1) of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 702—10(1)), which provides:

"Evidence and adjudications in proceedings under this Act shall be admissible:

\*\*\*

(b) in criminal proceedings when the court is to determine the amount of bail, fitness of the defendant or in sentencing under the Unified Code of Corrections."

The defendant believes that evidence of juvenile adjudications is admissible only in the types of proceedings specified in section 2—10(1)(b). Because the capital sentencing provisions are not themselves contained in the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, pars. 1001—1—1 through 1008—6—1) but rather are found in section 9—1 of the Criminal Code of 1961 (Ill.

Rev. Stat. 1983, ch. 38, par. 9—1), the defendant concludes that juvenile adjudications are inadmissible at a capital sentencing hearing.

This court has previously held that juvenile adjudications are admissible as aggravating evidence at a capital sentencing hearing. (See *People v. Owens* (1984), 102 Ill. 2d 88, 112-13; *People v. Stewart* (1984), 101 Ill. 2d 470, 494.) Those decisions did not consider the statutory provision urged here, however. *Stewart* and *Owens* involved trials that occurred before the effective date of the provision at issue; *Owens* cited the new provision and said that it "apparently limits such proof of juvenile adjudications in sentencing hearings to those hearings conducted under the Unified Code of Corrections [citation]." *Owens*, 102 Ill. 2d at 113.

The guiding principle of statutory construction is to ascertain and give effect to the legislature's intent. (*Metropolitan Life Insurance Co. v. Washburn* (1986), 112 Ill. 2d 486, 492; *People v. Steppan* (1985), 105 Ill. 2d 310, 316.) We do not believe that the legislature intended, in enacting section 2—10(1)(b) of the Juvenile Court Act, to preclude the consideration of juvenile adjudications at capital sentencing proceedings. Section 5—5—3(c)(1) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3(c)(1)) provides, "When a defendant is found guilty of murder the State may either seek a sentence of imprisonment under Section 5—8—1 of this Code, or where appropriate seek a sentence of death under Section 9—1 of the Criminal Code of 1961." For our purposes here, then, the reference in section 2—10(1) of the Juvenile Court Act to "sentencing under the Unified Code of Corrections" may be construed as incorporating by reference the death penalty provisions. In that way, then, the legislature ensured that juvenile adjudications would be admissible in all adult sentencing proceedings. We therefore conclude

that the defendant's juvenile .adjudications were properly admitted into evidence at the capital sentencing hearing in this case.

## B

The defendant also argues that defense counsel was ineffective for failing to present any mitigating evidence at the death penalty hearing. The hearing that was held in this case was relatively brief, and it was conducted before the trial judge alone. Neither the State nor the defendant presented any live testimony; rather, the parties stipulated to the introduction of the testimony taken at trial, and, as noted above, the State presented information regarding the defendant's juvenile and adult record. In support of his claim of ineffective assistance, the defendant notes that he did not have an extensive criminal record—which was the point urged by defense counsel at the sentencing hearing—and he avers that favorable testimony could have been obtained from two persons with whom the record shows the defendant had good relationships: his mother, and the alibi witness, Shirley Evans.

"[T]he failure to offer evidence in mitigation does not, in and of itself, demonstrate incompetence. (*People v. Lewis* (1984), 105 Ill. 2d 226, 249; *People v. Kubat* (1983), 94 Ill. 2d 437, 488.)" (*People v. Shum* (1987), 117 Ill. 2d 317, 370; see *Burger v. Kemp* (1987), 483 U.S. 776, 97 L. Ed. 2d 638, 107 S. Ct. 3114.) The trial judge in this case was, of course, aware of the defendant's short criminal history apart from the offenses here, but the record contains no other indications of what mitigating evidence defense counsel could have introduced or might have argued. The defendant's alibi witness, Evans, had not proved to be a credible witness, and counsel would have been justified in concluding that the trial judge would view with skepticism, if not outright

disbelief, further testimony from her. The defendant's suggestion in this appeal that the record shows that he had a good relationship with his mother appears to be based on the explanation he gave at trial to account for his presence at her house at the time of the arrest. It is not apparent from the record, however, what favorable information or impressions she could have provided. Thus, unlike *Dillon v. Duckworth* (7th Cir. 1984), 751 F.2d 895, which the defendant cites, there is no showing here that defense counsel, who was an experienced trial attorney, failed to present mitigating evidence of which he was aware. We do not believe that the record in this case supports the defendant's argument that he was denied the effective assistance of counsel at the sentencing hearing.

## C

The defendant also makes a number of constitutional challenges to the Illinois death penalty statute (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) under the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV). Contrary to the defendant's view, the statute is not invalid for the discretion accorded to prosecutors in deciding whether to seek the death penalty in a particular case. (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43.) The capital sentencing decision requires a balancing process, and for that reason this court has previously rejected the argument that the statute imposes on a defendant the burden of establishing mitigating circumstances sufficient to preclude imposition of the death penalty. (*People v. King* (1986), 109 Ill. 2d 514, 546-47; *People v. Caballero* (1984), 102 Ill. 2d 23, 49.) Moreover, the absence of specified limits on nonstatutory aggravating circumstances that the sentencer may consider and the absence of a re-

quirement that the sentencer provide a written memorial of his findings do not mean that the statute fails to ensure that only relevant information is considered in the sentencing process. (*People v. Guest* (1986), 115 Ill. 2d 72, 111-12; *People v. Neal* (1985), 111 Ill. 2d 180, 202-03; *People v. Perez* (1985), 108 Ill. 2d 70, 97-98.) The defendant does not contend that any irrelevant information was used at the sentencing hearing, or that the trial judge's decision to impose the death penalty rested on irrelevant grounds.

The defendant also contends that the death penalty statute is unconstitutional because he believes that it has been interpreted as barring the consideration of sympathy for a defendant in the sentencing determination. In *Brown v. California* (1987), 479 U.S. 538, 540, 93 L. Ed. 2d 934, 939, 107 S. Ct. 837, 839, the Supreme Court approved for use in capital sentencing hearings an instruction directing jurors not to be swayed " 'by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.' " The Court rejected the argument that the instruction, with its reference to sympathy, would interfere with the sentencing jury's consideration of mitigating evidence. Rather, the Court believed that the jurors would "understand the instruction not to rely on 'mere sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." (*Brown*, 479 U.S. at 542, 93 L. Ed. 2d at 940, 107 S. Ct. at 840.) Consistent with that view, the decisions of this court have held that the sentencing determination is to be based on the evidence presented in the particular case and not on extraneous influences. (See *People v. Morgan* (1986), 112 Ill. 2d 111, 145-46; *People v. Wright* (1985), 111 Ill. 2d 128, 163-68.) There is no indication from the record in this case that the trial judge,

in sentencing the defendant to death, disregarded or failed to consider any relevant information.

As a final attack on the constitutionality of the Illinois death penalty statute, the defendant, who is black, argues that the provision has a discriminatory effect on both minority defendants and defendants whose victims are white. In support of this argument, the defendant relies on a study of death penalty practices in several different States, including Illinois. (Gross & Mauro, *Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization*, 37 Stan. L. Rev. 27 (1984).) Notably, a similar contention failed recently in *McCleskey v. Kemp* (1987), 481 U.S. 279, 95 L. Ed. 2d 262, 107 S. Ct. 1756, which involved a study on racial discrimination and the death penalty in Georgia, and we believe that a similar result must obtain here. See *People v. Davis* (1987), 119 Ill. 2d 61.

## D

As a final matter, the defendant contends that his conviction for aggravated arson must be reversed because the statute under which the offense was charged has since been found to be unconstitutional. The basis for the charge was section 20—1.1(a)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 20—1.1(a)(1)), which this court invalidated in *People v. Johnson* (1986), 114 Ill. 2d 69. Accordingly, the defendant's conviction for the offense must be reversed.

The defendant makes the related argument that a new sentencing hearing is necessary because of the invalidity of the aggravated arson conviction. We do not agree. That conviction did not serve as the predicate for the defendant's eligibility for the death sentence. The defendant was convicted in this case of the murders of four persons, and the circuit court's judgment order specifies that the statutory aggravating circumstance on

which eligibility was based was the multiple-murder provision, section 9—1(b)(3) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3)). We do not believe that the trial judge's consideration of the conduct giving rise to the invalid charge would have been improper.

## III

For the reasons stated, the defendant's convictions for murder and his sentence of death are affirmed, his convictions for concealment of a homicidal death are affirmed, and his conviction for aggravated arson is reversed. The clerk of this court is directed to enter an order setting Tuesday, March 29, 1988, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is currently confined.

*Judgment affirmed in part*
*and reversed in part.*

JUSTICE SIMON, dissenting:

In assessing the effectiveness of counsel at capital sentencing hearings, my colleagues are disregarding recent Federal court decisions that suggest that we should reconsider and abandon our prior holding that the failure to offer evidence in mitigation does not demonstrate incompetence of counsel. (See 121 Ill. 2d at 389.) In particular, *Dillon v. Duckworth* (7th Cir. 1984), 751 F.2d 895, and *Gaines v. Thieret* (N.D. Ill. 1987), 665 F. Supp. 1342, demonstrate that the Federal courts intend to ov-

erturn death sentences that we affirm based on the majority's view that defense counsel's failure to introduce any evidence in mitigation does not indicate ineffective assistance of counsel. Because I agree with the position followed by the Federal courts that a wholly unexplained decision not to offer any mitigation evidence in a capital sentencing hearing is strong evidence of ineffective assistance of counsel, and because I see no reason to prolong this case by waiting for reversal on Federal *habeas* review, I dissent.

In *Dillon*, the Court of Appeals for the Seventh Circuit found that a counsel's "almost nonexistent effort to avoid the death penalty once [defendant's] guilt was established is incomprehensible and was extremely prejudicial to [defendant]." (*Dillon v. Duckworth*, 751 F.2d at 901.) There the court did not reach the question whether this "incomprehensible" behavior alone constituted ineffective assistance, because counsel's performance at trial was so deficient that the court ordered a retrial. *Dillon*'s message for defense counsel in capital sentencing hearings is nonetheless clear: the failure to call any character witnesses or to make a reasonable effort to present mitigating factors indicates a lack of preparation sufficient to form the basis of an ineffective-assistance claim.

The majority attempts to distinguish *Dillon*, noting that defendant made no showing that his counsel had "failed to present mitigating evidence of which he was aware." (121 Ill. 2d at 390.) But the point of *Dillon* was that counsel was so inexperienced and under such stress that he did not try to discover or present mitigating factors. At least in *Dillon*, defense counsel called defendant to testify that the defendant was only 18 years old, had no previous criminal record and had not intended to kill anyone. In this case, the sum total of defense counsel's efforts at the sentencing hearing is as follows:

"The Court: Mr. Washington, do you care to present any mitigation on behalf of your client?

Mr. Washington: No, your Honor. Other than to state to your Honor that we feel that there is a lack of significant criminal history on the part of this defendant. We are mindful of the two juvenile convictions, but we feel that that does not fall within the category that is anticipated by the statute in which a lack of significant criminal history should be considered as a mitigating factor. Other than that, we have no mitigation."

This almost nonexistent effort does not fall "within the wide range of reasonable professional assistance" required by *Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.

Paradoxically, the majority seems to recognize that by virtue of the defendant's good relationship with his mother, she was a logical character witness, yet it uses the lack of any record of what she might have said to support its view that counsel's failure to offer mitigating evidence did not demonstrate incompetence. (121 Ill. 2d at 389-90.) I respectfully suggest that this view completely distorts the ineffective-assistance inquiry. The lack of evidence introduced in mitigation does not imply counsel was effective; rather, it suggests he was ineffective. Moreover, the implication that no mitigating evidence was available is belied by the death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)) and our previous case law (*e.g., People v. Stewart* (1984), 104 Ill. 2d 463, 492-93), which demonstrate that the type of mitigating evidence admissible at a sentencing hearing is by no means limited. In fact, as commentators have noted, the list of potential mitigating factors is virtually endless. (See, *e.g.*, Comment, *Effective Assistance of Counsel: Strickland and the Illinois Death Penalty Statute*, 1987 U. Ill. L. Rev. 131, 154-55; Balske, *New Strategies for the Defense of Capital Cases*, 13 Akron L. Rev. 331,

360 (1979) (suggesting several potential mitigating factors, including alcohol or drug addiction and defendant's precarious mental state at the time of crime).) In this case, it takes little imagination to see the potential mitigating evidence available, in particular, that defendant was 33 years old and his only criminal record was over 15 years ago, that he maintained a good relationship with his mother and that he was under the influence of cocaine at the time of the crime.

The majority also speculates that the trial judge might not have believed defendant's alibi witness. (121 Ill. 2d at 389-90.) However, this speculation does not explain or excuse counsel's failure to call her as a character witness. Responding to a similar argument presented in *Gaines*, the district judge wrote:

> "The remaining mitigating evidence available simply had no downside risk. Arguably, the jury might not attach much weight to the testimony *** however, something is still better than nothing. Even if counsel had the sense that [defendant's] family was generally hostile toward him, *** we again point out that there is no evidence that the family members would not testify in his behalf or that they wanted [defendant] to receive the death penalty." (*Gaines*, 665 F. Supp. at 1366.)

Here, as in *Gaines*, the record reveals no strategic rationale for counsel's decision to present no mitigating evidence at the sentencing hearing. "Instead, without mitigating evidence, counsel essentially left [defendant] with no defense at all. Such an approach *** could only produce the worst possible result for his client and cannot, under these circumstances, be considered 'sound trial strategy.' " *Gaines*, 665 F. Supp. at 1367-68.

Not only do I agree with the court in *Gaines* that such total failure to present mitigating factors fulfills the requirements of the first prong of the *Strickland* ineffective-assistance analysis, but also I believe that the cir-

cumstances present here are "so likely to prejudice the accused that such prejudice need not be shown, but instead will be presumed." (*People v. Hattery* (1985), 109 Ill. 2d 449, 461.) Normally, to state a valid ineffective assistance of counsel claim, defendant must show that there is a reasonable probability that the counsel's ineffectiveness made a difference in the outcome. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) But as we noted in *Hattery*, in cases in which counsel utterly fails in his role as advocate to test the prosecution's case, defendant's sixth amendment rights to effective assistance of counsel have been violated, and the outcome is presumptively unreliable. *Hattery*, 109 Ill. 2d at 461; see also Comment, *Effective Assistance of Counsel: Strickland and the Illinois Death Penalty Statute*, 1987 U. Ill. L. Rev. 131 (suggesting that *Strickland* requires Illinois courts to adopt a *per se* rule of ineffective assistance where prosecution has shown aggravating factors and defense counsel fails to present mitigating evidence).

In this case, the prosecution had presented its case—showing that defendant was eligible for the death penalty and arguing that defendant's juvenile record precluded defendant from arguing no prior criminal activity as a mitigating factor. The Illinois death penalty statute requires that a judge who determines that defendant is eligible for the death penalty must sentence that defendant to death if it is also determined that there are no mitigating factors sufficient to preclude imposition of a death sentence. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(h); see also *People v. Owens* (1984), 102 Ill. 2d 88, 113-14 (holding that section 9—1(h) is mandatory).) Though I continue to believe it unconstitutional, this court has interpreted section 9—1 to mean that "once the State established the existence of statutory aggravating factors defendant had the burden of coming forward with evi-

dence of mitigating factors sufficient to preclude imposition of the death penalty." (*People v. Olinger* (1986), 112 Ill. 2d 324, 351; see also 112 Ill. 2d at 355 (Simon, J., dissenting).) Thus, defense counsel's failure to present mitigating evidence was tantamount to conceding that defendant should be sentenced to death.

I believe that defense counsel's failure to come forward with any mitigating evidence undermines the reliability of the sentencing hearing by destroying its adversarial nature. As the Supreme Court explained in the companion case to *Strickland*:

> "[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.' [Citation.] The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." (*United States v. Cronic* (1984), 466 U.S. 648, 656-57, 80 L. Ed. 2d 657, 666, 104 S. Ct. 2039, 2045-46.)

Defense counsel's perfunctory representation of defendant at the sentencing hearing causes me to believe that "[c]ounsel simply did not subject the State's case to meaningful adversarial testing that would justify our reliance on the proceeding as having produced a just result." *Gaines*, 665 F. Supp. at 1371.

Even if prejudice is not presumed in this case, I believe that *Strickland*'s second prong is met here. *Strickland* requires that to show prejudice "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence

in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) Considering the wide discretion vested in the capital sentencer to dispense mercy, it is impossible to determine with confidence sufficient under *Strickland* that defendant was not prejudiced by his counsel's failure in the sentencing hearing. Several commentators have pointed out that the ultimate effect of defense counsel's failure to present mitigating evidence at a capital sentencing hearing simply cannot be gauged. (*E.g.*, Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 350-54 (1983); Comment, *Effective Assistance of Counsel: Strickland and the Illinois Death Penalty Statute*, 1987 U. Ill. L. Rev. 131, 146-47.) Assessing errors taking place at a capital sentencing hearing, this court has similarly hypothesized that "where a sentencer's discretion in weighing the aggravating and mitigating factors is quite wide, the predicate for harmless-error review—an ability to ascertain the impact of an error on the decision maker—is missing." (*People v. Simms* (1988), 121 Ill. 2d 259, 274.) In such an uncertain area, where the decisionmaker's discretion is wide and the adversarial nature of the proceeding is compromised, how much confidence can one place in the outcome? To ensure the fairness and reliability of the imposition of this ultimate sentence, *Strickland* requires more than speculation with respect to how the addition of mitigating evidence might have affected the sentencer's decision.

I am aware that my position is in conflict with the holdings of several of our previous cases, but if the Federal courts are going to remand such cases for resentencing, I see no reason why this court should not reconsider the reasoning of these cases. For example, when we considered Gaines' ineffective-assistance claim, this court found no prejudice in light of the substantial evi-

dence in aggravation. We also noted that Gaines had failed to indicate what evidence could have been offered at the sentencing hearing. (*People v. Gaines* (1984), 105 Ill. 2d 79, 94-95.) Nevertheless, on *habeas* review the Federal district court vacated the death sentence and remanded the case for a new sentencing hearing. (*Gaines*, 665 F. Supp. 1342.) Here, the majority simply cites some of the cases the district court found unpersuasive in *Gaines*, notes that the record does not reveal what mitigating evidence could have been presented, and rejects defendant's ineffective-assistance claim. Rather than disregarding the *Gaines* decision and awaiting reversal on Federal *habeas* review, I would reconsider those holdings that are inconsistent with the *Gaines* and *Dillon* decisions in the Federal courts, and in this case order a new sentencing hearing.

In addition, I adhere to my view that the Illinois death penalty statute is unconstitutional for the reasons stated in my dissent to *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting). I also agree with Justice Marshall's calling for Supreme Court review of "a scheme that gives the prosecutor the unbridled discretion to select, from the group of individuals convicted of an offense punishable by death, the subgroup that will be considered for death." *Eddmonds v. Illinois* (1984), 469 U.S. 894, 896, 83 L. Ed. 2d 207, 208, 105 S. Ct. 271, 272 (Marshall, J., dissenting); see also *People v. Johnson* (1987), 119 Ill. 2d 119, 152-53 (Simon, J., dissenting) (citing cases and articles that argue that prosecutorial discretion must be limited to prevent arbitrary and capricious imposition of the death penalty).

For the foregoing reasons, I respectfully dissent.