FOURTH DIVISION

September 12, 2002

No. 1-01-1993

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County. 

)

) No. 99 CR 16598

)

CALVIN CRAIG, ) Honorable

) Michael Buckley Bolan,

Defendant-Appellant. ) Judge Presiding.

JUSTICE GREIMAN delivered the opinion of the court:

Defendant Calvin Craig was indicted, 
inter alia
, for the first degree murder of Christopher Smith and Latisha Midderhoff, two counts of aggravated discharge of a firearm, and the aggravated battery of Antwon Bishop and Quintius Taylor with a firearm.  After a bench trial, he was found guilty of the murder of Smith, the two counts of aggravated discharge of a firearm, and the aggravated battery of Bishop and Taylor with a firearm, but not guilty of the murder of Midderhoff.  The court sentenced the defendant to 45 years' imprisonment for murder, 15 years for the aggravated battery of Bishop with a firearm, and 15 years for the aggravated battery of Taylor with a firearm.  In addition, the court merged the two counts of aggravated discharge of a firearm into the two counts of aggravated battery with a firearm.

In its findings of fact, the trial court ordered the defendant's 45-year sentence for his murder conviction to be served consecutive to his 15-year sentence for the aggravated battery of Bishop with a firearm, and ordered his 15-year sentence for the aggravated battery of Taylor with a firearm to be served concurrently.  However, the court did not mention to which sentence the sentence for the aggravated battery of Taylor was to be served concurrently.  The mittimus in this case reiterates that the defendant was sentenced to 45 years for the murder charge, 15 years for the aggravated battery of Bishop with a firearm, and 15 years for the aggravated battery of Taylor with a firearm; and that the two counts of aggravated discharge of a firearm merged into the two aggravated battery counts.  The mittimus then states that the sentence for the aggravated battery of Taylor was to be served concurrently with the murder sentence, but states nothing with regard to whether the sentence for the aggravated battery of Bishop was to be served concurrently or consecutively to either of the other two sentences.  Because of the mittimus, the State asserts, the Illinois Department of Corrections now believes that all of the defendant's sentences are to run concurrently.  Defendant now appeals, and for the reasons that follow, we affirm in part and vacate in part.

At trial, the following events were related by a number of witnesses.  On August 20, 1998, at approximately 3:40 p.m., Bishop picked up Taylor and Smith in a white conversion van at the corner of 69th Street and Halsted Avenue in Chicago.  While Bishop drove, Smith sat in the front seat with Taylor in the backseat behind the driver.  Smith, Taylor, and Bishop were all friends and all belonged to the Black Disciples street gang.  After stopping briefly at Smith's house, they drove around the Englewood area looking for a "weed spot" where they could buy some marijuana.

Around 4 p.m., they were driving north on Green Street when Bishop stopped the van at a stop sign on the corner of 71st and Green Streets.  On the east side of Green Street, between 71st and 70th Streets, stood a man leaning on a parked white car.  Meanwhile, a man purported to be the defendant walked out of a building on the east side of the street, crossed the street to the west side, stood next to a parked blue van, and looked southbound toward the white van that Bishop was driving.  As Bishop began to drive through the intersection and alongside the blue van, the defendant allegedly brandished a gun and started shooting at the driver's side of the white van while the other man started shooting at the passenger side.  When the defendant allegedly began to shoot, he was approximately three to four feet away from Bishop's van.

During the shooting, a bullet struck Smith in his back, continued upward, and lodged in the right side of his tongue.  Bishop, who was also hit in the chest and in the arm, accelerated northbound and then turned east onto 69th Street, hitting some parked cars along the way because he had ducked his head after the shooting began.  At some point during the shooting, further up the street, Latisha Midderhoff was also hit in the chest with a bullet.  After turning the van onto 69th Street, Bishop and Taylor saw blood coming out of Smith's mouth and realized that he was badly hurt.  They then drove to St. Bernard's Hospital, where Smith and Bishop were admitted to the emergency room and treated.  While Bishop and Smith were being treated, Taylor noticed that defendant's cousin, Pierre Freeman, who was also a Black Disciple, had entered the hospital.  Fearing an attack from Freeman, Taylor got the keys to Bishop's van and fled the hospital.

At approximately 4:45 p.m. that same afternoon, Officer Peter Larcher was instructed to go to the area of 7000 South Green Street regarding a shooting that occurred in that neighborhood.  In the course of his investigation, Officer Larcher photographed bloodstains in front of 6844 Green Street and recovered a 9-millimeter cartridge case in a vacant lot at 6951 South Green Street.  He then photographed a car that had taken firearms damage in front of 7047 South Green Street and recovered a bullet from the vestibule of a residence at 7023 South Green Street.  He then proceeded south on Green Street and eventually recovered 16 cartridge cases from the general vicinity.  Officer Larcher then concluded his on-site investigation and proceeded to St. Bernard's Hospital, where he recovered a T-shirt and discovered blood on the driveway to the emergency entrance.  Some time that afternoon, Smith died of his injuries and Bishop was transferred to Cook County Hospital.

That afternoon, Detectives O'Brian and Murray, who were also assigned to the case, went to 6902 South Emerald Avenue, where police had recovered the white van that Bishop was driving.  Detectives O'Brian and Murray noticed that the exterior of the van was damaged by numerous bullet holes and that there was a large amount of blood on the front passenger seat as well as on the interior and exterior of the passenger door.  They then notified Officer Larcher and instructed him to process the van.

While Officer Larcher processed the van and proceeded with his own forensic investigation, Detectives O'Brian and Murray went to the location of the shooting.  When they arrived, they spoke with the beat officers on site to get an idea of what had happened.  They then searched the area for physical evidence and canvassed the area in an attempt to locate witnesses.  The detectives next drove to Cook County Hospital, where they were able to speak briefly with Bishop for approximately 10 to 15 minutes.  In that conversation, Bishop was able to describe the two shooters.  He identified the first shooter as a black male, 5 feet 7 inches to 5 feet 10 inches tall, approximately 25 years of age with a medium complexion and a fade-type haircut.  He described the second shooter as also being a black male with the same general characteristics as the first shooter, except that this person had a light complexion.  The detectives then began searching for Taylor.

At about that same time, Detective Griffin began investigating the shooting of Latisha Midderhoff, which had occurred in front of the building at 6844 Green Street.  To that end, he went to Christ Hospital and learned that she had died as a result of a gunshot wound that she had sustained.  After viewing Midderhoff's body and speaking with the medical personnel who had rendered assistance to Midderhoff, Detective Griffin recovered and inventoried a bullet that they had found in her clothing.   

On August 24, 1998, Brian Mayland, an expert in the field of firearms and a forensic scientist with the Illinois State Police, received inventories from the murder investigations of Midderhoff and Smith.  One of the inventory bags held three sealed envelopes.  The first envelope contained six 9-millimeter cartridge cases, the second contained nine 9-millimeter Luger cartridge cases, and the third held one 9-millimeter Luger cartridge case.  After performing tests on these 16 cartridge cases, Mayland was able to determine that 15 of the cartridge cases were fired from the same gun.  He was unable, however, to determine that the one remaining cartridge case was fired from the same gun as the other 15.

A second inventory bag also contained three envelopes.  Two of the envelopes held one fired bullet each while the third contained a metal fragment.  Mayland performed tests on the two bullets and determined that they were each fired from a 9-millimeter gun.  Mayland then performed tests on the metal fragment in the third envelope and determined that the fragment was consistent with a lead bullet core.  However, because the bullet was so deformed, he was unable to determine its class characteristic to determine whether it was fired from a 9-millimeter gun.

On September 12, 1998, police officers James Weyforth and Jerry Pentimore of the Chicago police department had occasion to stop a vehicle driven by the defendant, who presented his license.  Leaving his license with the officers, the defendant fled from the scene at a high rate of speed.  During the chase, a gun was thrown from the window of the vehicle which was later recovered and found to be a 9-millimeter weapon.  The gun was fully loaded at the time and subsequently was inventoried in the police department.  

At trial, Mayland testified that the bullets found at the scene of the offense 
could
 have been fired from that gun, but that he could not make a conclusive identification.  Specifically, he stated that, like the bullets he recovered at the scene of the crime, the bullets from the gun that defendant defenestrated were "nine millimeter, with six lans grooves, a right-hand twist and a one to one and quarter ratio."  However, after microscopic testing, he could "neither identify them nor eliminate them from having come from [the recovered] gun."  He also testified that there were a minimum of 100,000 of those types of weapons on the streets. 

On September 18, 1998, Taylor and Bishop were found and were transported to Area One headquarters for questioning.  Upon arriving at Area One, both Bishop and Taylor were taken to separate offices within the department and each of them spoke individually with Detectives O'Brian and Murray regarding the details of the shooting.  The detectives first spoke with Bishop.  He stated that he saw an individual leave the building at 7049 South Green during the incident. Bishop then told the detectives that this individual walked to the west side of the street and stood in front of a van.  Bishop stated that as they passed this individual in their van, another man on the east side of the street produced a gun and started shooting at their van.  Bishop claimed that he observed the person who was shooting on the west side of the street better than the other shooter.  Lastly, he stated that although he did not know the name of either one of the shooters, he would be able to identify either one of them.

Detectives O'Brian and Murray then interviewed Taylor, who related essentially the same story as Bishop.  Taylor stated that on the day in question, the defendant, whom he identified as "C-Man," was standing south of the alley on the west side of the street and that he, Taylor, personally saw the defendant shooting at their van.  Taylor also stated that there was another person on the east side of the street near an apartment building whom he saw fire a weapon as well.  After relating his story to the detectives, Taylor was shown a computer-generated photo of the defendant to verify Taylor's identification of the defendant as one of the shooters.  Taylor concluded by stating that the reason why he had not come forward sooner was that the defendant was a high-ranking member of the Black Disciples and that Taylor feared retribution if he came forward and told the police what he knew.

On November 21, 1998, Assistant State's Attorney Ron Dewald (ASA Dewald) traveled to Area One headquarters after receiving an assignment regarding the murder investigation of Midderhoff and Smith.  While there, he interviewed Taylor for approximately one hour while Detective Murray was present.  During this interview, Taylor was shown a picture of the defendant, and Taylor again identified the defendant as "C-Man."  At the conclusion of the interview, ASA Dewald asked Taylor if he would give a handwritten statement.  When Taylor agreed, ASA Dewald began to ask Taylor questions and wrote out the statement based upon Taylor's answers.  After the statement was completed, ASA Dewald gave it to Taylor to review it.  After each page was read and reviewed, ASA Dewald asked Taylor, "is everything in here correct?" and Taylor would say "yes" or "no."  ASA Dewald then asked for Taylor to mark the corrections and for Taylor and Detective Murray to sign the bottom.

Approximately 2 1/2 months later, an arrest warrant was secured for the defendant.  On February 10, 1999, Detectives O'Brian and Murray submitted defendant's picture and "wanted information" to the Daily Bulletin, a document that detailed information on wanted offenders.

On February 24, 1999, the defendant was stopped in Michigan by a Michigan state trooper, James Coleman.  The defendant gave Trooper Coleman a driver's license in the name of Kevin Miller.  After checking the license on the police computer, Trooper Coleman made a second approach of the defendant's car.  When Trooper Coleman asked the defendant to step out of the car in order to check for narcotics, the defendant drove off.  A high-speed chase ensued culminating in the defendant's arrest.  The defendant later appeared in court, pled guilty to those traffic charges, and received 30 days in the county jail.  It was at that point that Trooper Coleman asked to have the defendant's fingerprints retaken, which was done after the conclusion of the court proceedings.

Soon thereafter, Detectives O'Brian and Murray learned that the defendant had been involved in a high-speed chase with the Michigan State Police and had been taken into custody as a result.  Several days later, Trooper Coleman was informed that "Kevin Miller" was in fact the defendant, Calvin Craig, and that the defendant was wanted on an outstanding homicide arrest warrant in Cook County.  

Once defendant was transported to Area One headquarters and advised of his 
Miranda
 rights, Detective O'Brian allegedly asked the defendant if he knew why he had been arrested.  Purportedly, the defendant responded, "for murder."  Defendant was then asked if he knew for which murder he had been arrested, and the defendant apparently indicated that he was under arrest for the murder that had occurred at 71st and Green Streets.  Defendant then indicated that he did not want to say anything else, and the conversation ended.

On June 24, 1999, the detectives were able to locate Bishop and Taylor and bring them to Area One headquarters.  At approximately 10 p.m., Detectives O'Brian and Murray had Bishop and Taylor individually view a lineup in which the defendant was a participant.  After examining the lineup, both Taylor and Bishop separately identified the defendant as one of the shooters.  

Shortly after he had viewed the lineup, Bishop was then taken to a side office on the second floor where Assistant State's Attorney John O'Grady (ASA O'Grady) conducted an oral interview with Bishop while Detective O'Brian was present.  When it concluded, ASA O'Grady asked Bishop if he minded giving a handwritten statement.  Bishop agreed, and ASA O'Grady wrote out the statement based upon the interview that had just been conducted.  With no major differences, Bishop described the incident as he had before with Detectives O'Brian and Murray.    After the statement was completed, ASA O'Grady gave it to Bishop to review it.  After each page was read and reviewed, ASA O'Grady asked Bishop, "is everything in here correct?" Bishop would say "yes" or "no," and ASA O'Grady would then ask Bishop to mark his corrections and  to sign the bottom.

On July 2, 1999, Assistant State's Attorney Lynn McCarthy (ASA McCarthy) asked Bishop to appear before the grand jury that had convened regarding the murders of Midderhoff and Smith, and Bishop agreed.  He then testified before the grand jury and was shown his handwritten statement.  His testimony substantially reflected the same facts as those in his handwritten statement.  He was also asked if he had an opportunity to speak with ASA O'Grady and how he had been treated when he spoke with ASA O'Grady.  Bishop then acknowledged to the grand jury that he had read, reviewed, and signed the handwritten statement and that at no time was he handcuffed when he was brought in for questioning by the detectives.  Thereafter, on July 8, 1999, ASA McCarthy met with Taylor and reviewed his handwritten statement with him.  After Taylor read and reviewed the entire statement, he also testified to substantially the same facts as those found in his handwritten statement.  

At trial, however, when Taylor was called as a witness for the State, his attorney objected to his having to testify because she stated that he had a fifth amendment right not to testify at the trial.  The court disagreed and stated that Taylor's fifth amendment privilege had been waived by his having testified at the grand jury.  Accordingly, the court ordered him to testify.  On direct examination, Taylor
 recalled testifying to the contents of his handwritten statement before the grand jury and that he was telling the truth before the grand jury.  He also stated that he remembered telling the grand jury that he met with ASA Dewald and Detective Murray at Area One headquarters and told them the same facts that he had told the grand jury and that once his statement was written down, he signed it.  Lastly, he stated that he remembered telling the grand jury that he looked at his statement that the assistant State's Attorney had written for him and that he read it and reviewed it.

On cross-examination, however, Taylor stated that he had been smoking marijuana the afternoon of the shooting and that when he left the hospital, there was possibly more in the van.  He further stated that the police came looking for him that night and that he told them his name was Pierre Grant.  He stated that when the police picked him up later, they told him that he could be charged with a murder "because a girl [Midderhoff] was killed, which he did not want to happen."  He stated that he felt "scared" because he thought he could be charged with murder.  Accordingly, he stated that when the police then asked him who was outside the van, he told them that it was the defendant.  He did not, however, tell the police that he saw a gun in Calvin's hands firing a gun at the van.  In fact, he stated that he told Mr. John Ireman, a private defense investigator, that the part of the statement relating that he saw "C-Man" shooting at the van was not true.  Instead, as he told Mr. Ireman, he did not see the person who fired the shots on August 20, 1998.  "All I saw was C-Man in front of the van and that was the truth."

Similarly, when Bishop testified for the State, he stated that he was driving a van on August 20, 1998, with Smith and a man he only knew as "Quintin."  He stated that as they proceeded on Green Street north of 71st Street, someone was shooting at the van, and that he was shot in the chest.  However, he stated that because he ducked down, he did not get a chance to see who was shooting.  He did not recall telling the police that two subjects fired guns at him but that he could only recognize the one who was closest to him.  Moreover, he testified that he went to a lineup but did not recognize anyone in the lineup.  He stated that he did not recall meeting an assistant State's Attorney and that the handwritten statement alleged to be his was not in his handwriting and did not contain his signature at the bottom.  In addition he stated that he never read that document and that he never agreed to give a statement to anyone. 

Accordingly, because he claimed he never met any assistant State's Attorney, he stated that:  he never told ASA O'Grady that he had a friend named Quintius Taylor whom he had known for five years and a friend named Chris he had known for five years; he never told ASA O'Grady that they were members of the Black Disciples; he never told them that he saw the defendant at 7049 South Green and that he is known as C-Man and that he is a Black Disciple gang member; he never identified a photo of C-Man; and he never told anyone that C-Man held a gun and began shooting at their van as it drove past. Furthermore, he stated that he did not recall being in front of a grand jury in July of 1999, and he denied all questions that were allegedly given to him in the grand jury.  Lastly, he stated that he never even gave a statement to the defendant's counsel.

To counter that testimony, the State then sought to admit the grand jury testimony of both individuals into evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 1998)) as prior inconsistent statements.  The court found that those prior statements met the requirements of section 115-10.1 and admitted them into evidence.  

Robert Montgomery, a gang crimes officer, then testified about his investigation of gangs and, particularly, about the Black Disciples.  He noted that in August of 1998, there was a rift between two factions within the Black Disciples street gang.  On one side was a faction led by Marvel Thompson, the "Appointed King" of the Black Disciples.  The title of "Appointed King" signified that Thompson was second in command of the entire gang.  On the other side of the dispute was a faction led by Jerome "Shorty" Freeman, the "King" of the Black Disciples.  The title of "King" meant that Freeman was the leader of the entire gang.  At that time, Bishop was aligned with Thompson's faction, and the defendant, who was the nephew of Freeman and held the rank of "Board Member," was aligned with Freeman.  One of the disputed areas between these two factions was in the vicinity of 72nd Street and Green Street in Chicago, approximately one block from where the shooting in the instant case occurred.  Lastly, Montgomery described what is known as a "violation" in gang terminology, and noted that testifying in court against fellow gang members is considered a violation within a gang.
  A "violation," he continued, could result in a "beating or a killing start[ing] from a punch in the mouth that someone orders on another member." 

After the trial court found the defendant guilty and sentenced him, defendant filed a motion to reconsider his consecutive sentences.  That motion was denied.

Defendant's first claim is that the evidence presented at trial was "based on perjured, inconsistent testimony" and, therefore, was "insufficient to sustain a conviction."  For this, he notes that the primary evidence against him consisted of Bishop's and Taylor's grand jury testimony and their statements to police, both of which were recanted by both individuals on the witness stand.  In fact, defendant argues, "[t]he only possible other evidence–by stretching the circumstantial evidence to its breaking point–was the fact that sometime later the defendant was in possession of a weapon that was one of hundreds of thousands of weapons capable of having fired the shots which [
sic
] killed Christopher Smith and wounded Taylor and Bishop."  And, he claims, because neither one of these people can be believed as to what really happened at 71st and Green Streets on August 28, 1998, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Defendant concedes that matters of credibility are for the trial court, the trier of fact in this case, to decide and that this court should not rule on such matters because the trial court was in a position to observe the witness, assess his demeanor, and make credibility judgments based on a firsthand encounter with the witness.  See 
People v. Hornsby
, 277 Ill. App. 3d 227, 230-31 (1995).  Accordingly, he argues that the trial court could not have made the determination that Taylor's and Bishop's statements in the police station and in front of the grand jury were more credible than their trial testimony because the court never observed the witnesses' demeanor on those prior occasions.  

On the other hand, he argues, if the trial court assigned more credibility to Bishop's and Taylor's prior statements because they testified to those facts earlier in time, then such logic "flies in the face of all the law in this state that prior consistent statements are inadmissible to bolster a witness's credibility, even though the witness is still on the stand subject to cross-examination."  See 
People v. Emerson
, 97 Ill. 2d 487, 500 (1983).  He asks, "is a prior inconsistent statement more believable than a prior consistent statement?"  For if this court has held that prior consistent statements are inadmissible for bolstering a witness's trial testimony, he argues that "it must as a matter of logic follow that a conviction cannot stand based upon prior inconsistent statements."

In 
People v. Arcos
, 282 Ill. App. 3d 870 (1996), defendant notes, a conviction based on section 115-10.1 statements from a witness whom the trial court, in a bench trial, found was a " ‛thoroughly disreputable person who cannot be believed' " was reversed.  
Arcos
, 282 Ill. App. 3d at 871.  Despite the fact that the trial court found the witness's statement incriminating the defendant to be true, this court still reversed because the trial court gave the witness "absolutely no credibility" (
Arcos
, 282 Ill. App. 3d at 874), and because it found the corroborative evidence the trial court identified as bolstering the prior inconsistent testimony was lacking.  
Arcos
, 282 Ill. App. 3d at 876.  As in 
Arcos
, defendant argues, the corroboration evidence here only sheds light on how the killing happened, not who committed it.  
Arcos
, 282 Ill. App. 3d at 876.  Accord 
People v. Parker
, 234 Ill. App. 3d 273 (1992).

Here, defendant notes, the sworn testimony of Taylor at trial was that the defendant was standing outside the van with a weapon on the day and time in question.  At trial, he stated that the defendant never fired any shots, whereas in the grand jury, he said he did see the defendant fire shots.  Moreover, Bishop denied his own signature on documents that police and prosecutors witnessed him signing, and denied even appearing before the grand jury and testifying.  Thus, defendant argues that his conviction is based upon: (1) a prior inconsistent statement from Bishop, whom the State and the court branded as a perjurer; (2) a prior inconsistent statement from Taylor; (3) the defendant's possession of one of thousands of guns that could have done the shooting; and (4) Montgomery's testimony about an inter-gang rift without any foundation for that testimony or any indication that the defendant knew about that rift. Defendant concludes that this is not proof beyond a reasonable doubt. 

Defendant also takes issue with the State's decision to call Taylor and Bishop to the witness stand where, he alleges, the State knew that those individuals would perjure themselves.  Defendant notes that in opening statements the prosecutors expected that Bishop and Taylor were going to be uncooperative.  Nevertheless, he notes, the State put them on the stand for the express purpose of impeaching them and thus used (albeit indirectly) perjured testimony to convict the defendant.  Defendant argues that the true purpose of section115-10.1 is to allow a prosecutor to use a witness's previous testimony to rebut his trial testimony where the prosecutor is taken by surprise.  However, defendant asserts that section 115-10.1 should not be used to remove the constraint against using perjured testimony where the State knows exactly how the witness will testify.  No prosecutor, he concludes, has the right to present perjured testimony even though his motives are pure.  See 
In re Friedman
, 76 Ill. 2d 392 (1979). 

The State responds by noting the primary considerations in a challenge to the sufficiency of the evidence.  As this court noted:

"In considering a defendant's challenge to the sufficiency of the evidence, the relevant question is whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Oaks
, 169 Ill. 2d 409, 457-58, 662 N.E.2d 1328, 1349-50 (1996).  Therefore, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses. [Citation.]" 
People v. Anderson
, 325 Ill. App. 3d 624, 634 (2001).

Put another way, the factual findings of the judge in a bench trial will not be disturbed on appeal unless the evidence is so improbable or unsatisfactory that it creates reasonable doubt of the defendant's guilt.  See 
People v. Cox
, 195 Ill. 2d 378, 387 (2001).

The State then contends that the defendant is mistaken in claiming that the prosecutor presented no other credible evidence of defendant's guilt besides the prior statements of Bishop and Taylor.  First, 16 9-millimeter shell casings were recovered from the crime scene in close proximity to where the statements of Taylor and Bishop placed the defendant at the time of the shooting.  Second, several bullets recovered from the crime scene shared matching characteristics with the 9-millimeter gun that defendant threw out his car window during the car chase on September 12, 1998.  Third, at the time of the shooting, there was a dispute between two factions of the Black Disciples and that the defendant and Bishop were associated with different factions.  Additionally, the State notes that the area of 72nd and Green Streets was one of the disputed areas between the two factions.  Fifth, after the defendant was transported to Area One headquarters from Michigan, Detective O'Brian asked him if he knew why he was under arrest and the defendant responded, "for murder."  Subsequently, when the defendant was asked if he knew for which murder he was under arrest, he responded "71st and Green."  Lastly, it is uncontested that 
defendant twice fled from police.
   Accordingly, the State argues, the corroborative evidence supports Bishop's and Taylor's previous statements as well as the essential elements of the State's case.

Alternatively, the State claims that even if this court finds that there was no corroborative evidence in the instant case, the defendant is incorrect that a recanted prior inconsistent statement admitted under section 115-10.1 cannot support a conviction.  As this court held in 
People v. Morrow
, 303 Ill. App. 3d 671 (1999):

"Assuming 
arguendo
 that there was no corroborative evidence, it does not necessarily portend that, as a matter of law, a recanted prior inconsistent statement admitted under section 115-10.1 cannot support a conviction.  
People v. Curtis
, 296 Ill. App. 3d 991, 996-97, 696 N.E.2d 372, 376-77 (1998); accord 
People v. Zizzo
, 301 Ill. App. 3d 481, 703 N.E.2d 546 (1998).  In the present case, the previous inconsistent statements alone were sufficient to prove defendant's guilt beyond a reasonable doubt.  If a prior statement meets section 115-10.1's test, ‛a finding of reliability and voluntariness is automatically made. *** Accordingly, no additional analysis is needed.  *** [I]t is the jury's decision to assign weight to the statement and to decide if the statement was indeed voluntary, after hearing the declarant's inconsistent testimony.'  
People v. Pursley
, 284 Ill. App. 3d 597, 609, 672 N.E.2d 1249, 1257 (1996); see also 
People v. Carlos
, 275 Ill. App. 3d 80, 84, 655 N.E.2d 1182, 1184 (1995).  ‛Once a jury or trial court has chosen to return a guilty verdict based upon a prior inconsistent statement, a reviewing court not only is under no obligation to determine whether the declarant's testimony was "substantially corroborated" or "clear and convincing," but it may 
not
 engage in any such analysis.'  (Emphasis in original.)  
People v. Curtis
, 296 Ill. App. 3d at 999, 696 N.E.2d at 378; accord 
People v. Zizzo
, 301 Ill. App. 3d 481, 703 N.E.2d 546 (1998)."  
Morrow
, 303 Ill. App. 3d at 677.

Moreover, in determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, this court has held that there are no "suspect categories" of properly admitted evidence that require a different standard of appellate review.  
Curtis
, 296 Ill. App. 3d at 999.  Therefore, courts of review are not allowed to differentiate between types of evidence properly admitted before the trier of fact.  
Curtis
, 296 Ill. App. 3d at 999.  In other words, when a defendant is convicted and then appeals, one standard of review applies to all evidence.  
Curtis
, 296 Ill. App. 3d at 999.  As such, evidence of prior inconsistent statements properly admitted, even if later recanted, should be treated no differently.  
Curtis
, 296 Ill. App. 3d at 999.

The State then distinguishes the defendant's citation to 
Arcos
 and 
Parker
.  In his brief, the defendant states that these two cases stand for the proposition that "it does not necessarily follow that trial testimony rife with inconsistencies, perjury, and complete recantations would be sufficient in and of itself to sustain a murder conviction."  The State asserts that this was the same argument made by the defendant in 
Curtis
.  In 
Curtis
, the defendant contended that under 
Parker
 and 
Arcos
, a recanted prior inconsistent statement admitted under section 115-10.1 is insufficient, by itself, to sustain a conviction.  The 
Curtis
 court disagreed, stating: "We are not convinced that [
Parker
 and 
Arcos
] stand for the proposition defendant urges upon us, but if they did, we would decline to follow them."  
Curtis
, 296 Ill. App. 3d at 997.  Consequently, the State concludes that defendant's contention that these prior inconsistent statements are insufficient to convict is meritless.  

In response to defendant's allegation that the State knowingly presented false or perjured testimony, the State notes that while it is improper for a prosecutor to knowingly present false or perjured testimony, the burden of proving that the State knowingly used perjured testimony lies with the defendant.  
People v. Smith
, 139 Ill. App. 3d 21, 30 (1985).  However, inconsistencies in testimony cannot be equated with perjury, nor does it establish or show that the State knowingly used perjured testimony.  
People v. Amos
, 204 Ill. App. 3d 75, 85 (1990). 

The State also claims that it does not have any control over what a witness will say in the courtroom, which is precisely why section 115-10.1 was instituted in the first place, to prevent the same sort of recantations from cloaking the truth.  Here, the State argues, it "hoped" that Taylor and Bishop would, on the witness stand, identify the defendant as the killer of Smith as they had done in their handwritten statements and grand jury testimony.  Instead, when Taylor and Bishop recanted their previous testimony the State had to use section 115-10.1 to bring in those prior statements, just as had been done in 
Morrow
 and 
Curtis
.  Such inconsistency in the testimony of these two individuals falls short of showing the knowing use of perjury, the State argues, and, therefore, the defendant's argument on this matter must be rejected.

Ultimately, in deciding whether there was sufficient evidence to prove defendant guilty beyond a reasonable doubt, we must decide whether cases such as 
Arcos
 and 
Parker
 require that convictions based solely upon prior inconsistent statements must also have corroborating evidence to support the conviction.  As it stands, we agree with the defendant that much of the corroborating evidence seems to indicate 
how
 the crime was committed rather than by whom.  Moreover, the totality of that corroborating evidence was not in the trial record.  However, under 
Morrow
 and 
Curtis
, additional corroboration is not required and we are not to engage in looking for corroboration.  In light of the fact that 
Morrow
 follows the guidance from the supreme court in 
People v. Wilson
, 66 Ill. 2d 346, 349 (1977) ("whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury or the court"), and that the supreme court denied the appeals in both of these cases (see 
People v. Curtis
, 184 Ill. 2d 562 (1999); 
People v. Morrow
, 184 Ill. 2d 567 (1999)), we follow that analysis.

Mindful that the defendant does not quibble with the admissibility of Bishop's and Taylor's prior inconsistent statements, it is uncontested that they are pieces of evidence like all the rest upon which the trial court must render a decision.  By its judgment, the court determined that Bishop and Taylor were telling the truth when they made their prior statements and were lying at trial.  In looking at the record, moreover, we find that there is nothing to justify the substitution of this court's judgment for that of the trial court with respect to Bishop's and Taylor's credibility.  

With regard to the defendant's argument that the trial court's inability to consider the demeanor of a witness's pretrial, out-of-court statement makes it unable to render a credibility determination, such determinations are already built into the process of admitting statements under section 115-10.1.  See 
Morrow
, 303 Ill. App. 3d at 677.  To be sure, in 
Curtis
 and 
Morrow
 this court affirmed the trial court's determination that a witness's previous, out-of-court statements were more persuasive and more credible than his in-court testimony.  Here, because the trial court engaged in an admissibility analysis under section 115-10.1 and the defendant does not contend that Bishop and Taylor's prior statements were improperly admitted, he cannot honestly argue that the trial court was in no position to judge the statements' reliability.

We next address defendant's argument that the State knowingly used perjured testimony and therefore violated the defendant's right to due process.  Section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) creates a statutory hearsay exception for prior inconsistent statements of a witness in a criminal case under certain circumstances (725 ILCS 5/115-10.1 (West 2000)).  It provides in pertinent part:

"Admissibility of Prior Inconsistent Statements.  In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement–

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording."  725 ILCS 5/115-10.1 (West 2000).    
  

Nothing in the language of section 115-10.1 indicates that the State may only utilize its provisions when it is surprised that the witness will testify in a manner inconsistent with his prior statements.  If this court were to agree with defendant's argument, the State would be precluded from calling a witness whom it knew was going to testify in a manner inconsistent with his prior statements.  The whole purpose behind section 115-10.1 is to allow the trier of fact to consider not just a witness's current testimony, but his prior statements as substantive evidence.  If all a reluctant witness had to do to avoid testifying in a criminal case would be to tell the prosecutor he recanted his prior statements, the criminal justice system could effectively be crippled.

"[T]he policy reasons underlying section 115-10.1 of the Code as an exception to the hearsay rule include the fact that ‛substantive admissibility [of the hearsay] will protect parties from turncoat witnesses.'  (Steigmann, 
Prior Inconsistent Statements as Substantive Evidence in Illinois
, 72 Ill. B.J. 638 (1984).)   Thus, a substantive policy reason for section 115-10.1 of the Code was to prevent a turncoat witness from backing away from a former statement made under circumstances indicating it was likely to be true by merely denying the statement.
"  
People v. Fauber
, 266 
Ill. App. 3d
 381, 390-91 (1994).

In 
People v. Orange
, 121 Ill. 2d 364 (1988), out supreme court held that section 115-10.1 is constitutional:

"[T]he statute [i]s clearly within the legislature's authority.  (See 
People v. Rolfingsmeyer
 (1984), 101 Ill. 2d 137, 140 (‛[I]t is clear that "the legislature of a State has the power to prescribe new and alter existing rules of evidence or to prescribe methods of proof.' " (quoting 
People v. Wells 
 (1942), 380 Ill. 347, 354)).)  That this court has previously refused to allow the substantive use of prior inconsistent statements (see 
People v. Collins
 (1971), 49 Ill. 2d 179) did not preclude the legislature from doing so."  
Orange
, 121 Ill. 2d at 381.

Defendant next argues that he was prejudiced by the court's failure to honor Taylor's right to assert his privilege against self-incrimination.  U.S. Const., amend. V.  As noted, before Taylor testified, his counsel appeared and stated that she was advising her client that he had a fifth amendment right not to testify at trial based upon her review of the police reports.  In a discussion on the record, the trial court then attempted to ascertain the basis of Taylor's assertion of the privilege.  To support this contention, Taylor's attorney stated:

"Mr. Taylor was in a van at the time of the shooting *** and a young girl outside the van was shot and killed.  There are five witnesses I have come across in reviewing the police reports *** all of whom say that shots were fired out of the van."

The State responded by stating:

"Regarding witnesses counsel talked about, those witnesses were re-interviewed, specifically Shanet Nichols and another woman, that [
sic
] retracted their statements to the police that they saw anybody shooting from the van and that's just what they heard on the street.  There's no witness that's going to come in and testify that they observed [Taylor] shooting out of the van at all.  In fact, here is a copy of his handwritten statement as well as his grand jury testimony.  It does not implicate himself whatsoever."

The court then told the defendant's counsel that there were no proceedings against her client at that time and, in any event, the defendant had already waived his fifth amendment right because he testified before the grand jury.  The court then ordered Taylor to testify, which the defendant asserts was in error.

The State notes that, historically, most courts have found the fifth amendment privilege against self-incrimination is purely a personal one.  
People v. Lego
, 116 Ill. 2d 323, 339 (1987).  Therefore, under that analysis, a criminal defendant lacks standing to object to the introduction of evidence that violates another person's fifth amendment rights (see 
People v. Homes
, 274 Ill. App. 3d 612, 619 (1995); 
Couch v. United States
, 409 U.S. 322, 34 L. Ed. 2d 548
, 93 S. Ct. 611 (1973); 
People v. Shockey
, 67 Ill. App. 2d 133, 139 (1966)), even where that person's testimony also incriminates defendant.  
United States ex rel. Falconer v. Pate
, 319 F. Supp. 206 (N.D. Ill. 1970), 
aff'd
, 478 F.2d 1405 (7th Cir. 1973); 
United States v. Bruton
, 416 F.2d 310 (8th Cir. 1969). 

Initially, we note that neither 
Lego
 nor 
Homes
 involved the factual situation presented here – a witness asserting his or her fifth amendment right against self-incrimination.  In 
Shockey
, when the witness (the defendant's brother) invoked his fifth amendment rights, the State granted him immunity.  The appellate court held:  "The defendant claims the immunity order was not proper.  However, the defense of self-incrimination is a privilege that belongs to the party testifying and is not available to third parties. [Citations.]"  
Shockey
, 67 Ill. App. 2d at 139.

Shockey
 was recently cited, and followed, in a case not cited by either party, 
People v. Adams
, 283 
Ill. App. 3d
 520 (1996), which on its facts is strikingly similar to our own.  There, the defendant argued that the trial court erred when it refused to allow a witness to invoke his fifth amendment right against self-incrimination based on his belief that if he testified at trial, the State would bring perjury charges against him.  The State argued that the defendant did not have standing to raise this issue.  This court agreed, citing the same cases the State has cited here.  This court held: "The personal nature of the fifth amendment privilege precludes defendant from claiming any error based on the trial court's refusal to allow [the witness] to assert the privilege at trial."  
Adams
, 283 
Ill. App. 3d
 at 524.  Accordingly, it initially appears that the nature of the fifth amendment privilege precludes defendant from claiming any error based on the trial court's refusal to allow Taylor to assert the privilege at trial.

In his reply brief, defendant argues that in the case of 
Ohio v. Reiner
, 532 U.S. 17, 149 L. Ed. 2d 158
, 121 S. Ct. 1252 (2001), the United States Supreme Court implicitly held that a defendant has a right to complain that a witness in his trial was denied the right to assert the privilege against self-incrimination.  There, in an involuntary manslaughter case brought against the defendant for the death of his child, a babysitter who was in charge of the care of the defendant's child stated that she would assert her fifth amendment privilege prior to testifying.  The trial court then gave her transactional immunity at the State's request.  The Court of Appeals of Ohio, Sixth District, reversed the defendant's conviction on grounds not relevant to the discussion here.  The Supreme Court of Ohio affirmed the reversal, on the alternative ground that, because she maintained her innocence, the babysitter had no valid fifth amendment privilege and, therefore, that the trial court's grant of immunity was unlawful.  
Reiner
, 532 U.S. at 18-19, 149 L. Ed. 2d at 160-61
, 121 S. Ct. at 1253.

The United States Supreme Court disagreed and found that the fifth amendment privilege against self-incrimination extends not only to answers that would, in themselves, support a conviction, but also to those that would furnish a link in the chain of evidence needed to prosecute the claimant.  
Reiner
, 532 U.S. at 20, 149 L. Ed. 2d at 162
, 121 S. Ct. at 1254.  Accordingly, because the Court found that the babysitter had "reasonable cause" to apprehend danger from her answers if questioned at the defendant's trial, she should have been allowed to claim her fifth amendment privilege.  
Reiner
, 532 U.S. at 21, 149 L. Ed. 2d at 162-63
, 121 S. Ct. at 1255.

The importance of that decision to this case, defendant argues, is that nowhere in the United States Supreme Court decision did the Court hold that the defendant had no standing to object to the failure of the Ohio Supreme Court to allow the witness to assert her privilege.  Indeed, defendant notes that the Ohio Supreme Court specifically held that the defendant had such standing, contrary to the State's position in that case.  In 
State v. Reiner
, the Ohio Supreme Court stated:

"The state argues that a defendant lacks standing to challenge a grant of immunity. [Citations.]  This argument assumes that the grant of immunity met the statutory threshold of a valid privilege against self-incrimination.  Because [the witness] lacked a valid Fifth Amendment privilege against self-incrimination and the grant of immunity was unlawful, the state's standing argument lacks merit." 
State v. Reiner
, 89 Ohio St. 3d 342, 356, 731 N.E.2d 662, 675 (2000).

We note that upon remand, the Ohio Supreme Court affirmed the trial court's ruling that the witness had a valid fifth amendment right but still reversed the trial court's grant of immunity because it "did not further the administration of justice."  
Ohio v. Reiner
, 93 Ohio St. 601, 605, 757 N.E.2d 1143, 1146 (2001).  While the majority did not address the issue of standing, the dissenters did.  After citing the exact quote urged upon us by the defendant, the dissent opined: "The 
Reiner I
 majority's analysis was inextricably intertwined with the Fifth Amendment analysis.  Thus, the United State's Supreme Court's reversal of 
Reiner I
 necessarily undermines this court's original resolution of the standing issue."  
Ohio v. Reiner
, 93 Ohio St. at 607, 757 N.E.2d at 1148 (
Cook, J., dissenting, joined by Moyer, C.J., and Wolff, J.).

Ultimately, with regard to standing, we think that 
Reiner
 has changed the law concerning whether a defendant may argue the merits of an alleged violation of a witness's fifth amendment right not to testify.  As the defendant notes, "it is implicit in this decision that a defendant has a right to complain that a witness in his trial was denied the right to assert the privilege against self-incrimination."  If Reiner had no standing to complain, there would be no need for the Supreme Court to rule the way it did; the Court simply could have disposed of the issue in a brief paragraph.  Nonetheless, because the Court chose to take the issue on its merits, we can only assume that the Court now allows defendants to argue the merits of a third party's or witness's allegation that his or her fifth amendment right not to testify was violated.

Obviously, if we were to find that defendant has no standing to argue this issue, we could simply affirm the trial court's decision on that basis alone.  However, even our sententious view and discussion of 
Reiner
, we find, does not alter that outcome.  Assuming that the defendant has standing to argue a violation of Taylor's right to testify, we still find that the trial court properly ordered Taylor to testify, even if for the wrong reasons.  As noted in 
People v. Wilder
, 321 Ill. App. 3d 608, 618 (2001), "we have the authority to affirm or reverse the judgment of the circuit court on any ground supported by the record.  155 Ill. 2d R. 366; 
In re Marriage of Chapman
, 297 Ill. App. 3d 611, 619-20 (1998), citing 
Cohn v. Checker Motors Corp.
, 233 Ill. App. 3d 839, 843 (1992)."

Defendant correctly argues that the trial court was in error when it found that defendant had waived his fifth amendment privilege by testifying in a prior proceeding.  See 
People v. Stufflebeam
, 19 Ill. App. 3d 462, 464 (1974) (held that the defendant did not waive his right to assert his privilege against self-incrimination merely by testifying in a prior proceeding); 
United States v. Licavoli
, 604 F.2d 613, 623 (9th Cir. 1979) (held that voluntary testimony before a grand jury does not waive the privilege at trial).  In 
People v. Walker
, 28 Ill. 2d 585 (1963), the supreme court held that a witness's fifth amendment right against self-incrimination is not waived by the witness's prior testimony before the grand jury regarding the same facts.  "[T]he doctrine of waiver is limited to the particular proceeding in which the voluntary testimony was given."  
Walker
, 28 Ill. 2d at 588.  " ‛His voluntary testimony before a coroner's inquest, or a grand jury, or other preliminary and separate proceeding, e.g. in bankruptcy, is therefore not a waiver for the main trial; nor is his testimony at a first trial a waiver for a later trial.'  8 Wigmore on Evidence, 3rd ed. sec. 2276."  (Emphasis omitted.)  
Walker
, 28 Ill. 2d at 588.  
 

However, "[a] witness may be denied the privilege *** when it is ‛ "perfectly clear, from a careful consideration of all the circumstances in the case," ' that the answers sought ‛ "cannot possibly have [a] tendency" ' to incriminate. [
People v.
]
 Cooper
, 202 Ill. App. 3d [336,] 342 [(1990)], quoting 
Hoffman
[
 v. United States
], 341 U.S. [479,] 488, 95 L. Ed. [1118,] 1125
, 71 S. Ct. [814,] 819 [(1951)]."  
People v. McNeal
, 301 Ill. App. 3d 889, 893 (1998).   Indeed, "[t]he trial court, not the witness, must decide whether that witness has a valid basis for invoking the fifth amendment right against self-incrimination."  
Cooper
, 202 Ill. App. 3d at 342, citing
 
People v. Schultz
, 380 Ill. 539, 544 (1942).  Additionally, "the privilege  must not be extended to cover imaginary danger and must not in any event be permitted to be used solely for the purpose of protecting [a third party] from being convicted."  
Schultz
, 380 Ill. at 544.  

In other words, the court is required to conduct a hearing into whether a witness has "reasonable cause to apprehend danger from a direct answer."  
Hoffman
, 341 U.S. at 486, 95 L. Ed. at 1124
, 71 S. Ct. at 818.  Here, we find the trial court comported with that requirement.  As noted, in a discussion on the record, the court was informed that the witnesses who said "that shots were fired out of the van *** retracted their statements to the police that they saw anybody shooting from the van and that's just what they heard on the street."  And, as the State asserted in that hearing, "[t]here's no witness that's going to come in and testify that they observed [Taylor] shooting out of the van at all.  In fact, here is a copy of his handwritten statement as well as his grand jury testimony.  It does not implicate himself whatsoever."  In light of these statements, the court determined that there were no proceedings against Taylor.  In looking at the record, we agree with the trial court that there is nothing to indicate that Taylor had reasonable grounds to fear incriminating himself if he were to answer the questions put to him by the State or defendant.  Accordingly, because this finding was within the trial court's discretion and could have been used to compel Taylor's testimony, we affirm the trial court's decision to order that testimony.

[Nonpublishable material under Supreme Court Rule 23 (166 Ill. 2d R. 23) removed here.]

Although not raised in the defendant's brief, the State claims that the mittimus, as it appears in the common law record, is incorrect and must be amended to show that the defendant received consecutive sentences.  As noted, although the mittimus indicates that the defendant received a concurrent sentence, the record indicates that the trial court actually imposed a consecutive sentence on the defendant.  Because of the mittimus, the State asserts, the Illinois Department of Corrections now incorrectly believes that all of the defendant's sentences are to run concurrently.

As the State points out, this court may correct the mittimus itself and need not remand the matter to the trial court.  Presented with a similar set of circumstances, this court in 
People v. McCray
, 273 Ill. App. 3d 396 (1995), stated:

"The judgment order does not conform to the court's oral pronouncement at sentencing and the State concedes that the mittimus should be corrected to reflect the proper sentence imposed by the court.  Remandment is unnecessary since this court has the authority to directly order the clerk of the circuit court to make the necessary corrections.  (134 Ill. 2d R.615(b)(1); 
People v. Brown
 (1993), 255 Ill. App. 3d 425, 647 N.E.2d 340; 
People v. Mitchell
 (1992), 234 Ill. App. 3d 912, 601 N.E.2d 916)."  
McCray
, 273 Ill. App. 3d at 403.

In 
People v. Brown
, 255 Ill. App. 3d 425 (1993), which is cited by 
McCray
, this court analyzed a situation where the defendant was charged with possession of a controlled substance with intent to deliver, the jury found him guilty only of possession, and  the order of sentence and commitment reflected that defendant was sentenced to imprisonment for seven years for possession with intent to deliver.  
Brown
, 255 Ill. App. 3d at 438-39.  The court found that "[t]he proper remedy is to amend the mittimus to conform to the judgment entered by the court. [Citation.]
"  
Brown
, 255 Ill. App. 3d at 438.

Here, it is uncontested that the judgment order does not conform to the court's oral pronouncement at sentencing.  However, we must still address whether consecutive sentences in this case were proper.  Although not raised in his main brief on appeal, defendant, in a supplemental brief, argues that consecutive sentencing was improper.
(footnote: 1)  For this, he notes that under section 5-8-4(a) of the Unified Code of Corrections (730 ILCS 5/5-8-4(a) (West 1998)), a court must find that the offenses occurred in a single course of conduct and that one of the offenses is a "triggering offense."  In the instant case, the only potentially applicable triggering offense in section 5-8-4(a) is that the defendant committed a Class X or Class 1 felony where he "inflicted severe bodily injury during the commission of that felony."  See 
People v. Whitney
, 188 Ill. 2d 91, 98-99 (1999).

In its oral pronouncement, after it sentenced the defendant to 45 years' imprisonment for murder, the trial court stated:

"As far as the other counts are concerned, aggravated battery with a firearm, Count Eleven, Antwain [
sic
] Bishop, darn near killed him too, that meets the criteria set forth as to consecutive sentences this court finds.  He caused great bodily injury to Antwain [
sic
] Bishop.  The court will impose a consecutive sentence of 15 years."

Accordingly, defendant argues that where the court found "great bodily injury," and section 5-8-4(a) requires "severe bodily injury," the court incorrectly applied section 5-8-4(a).  Defendant notes that the legislature has throughout the Criminal Code used "great bodily harm" as an element of crimes, but uses "severe bodily injury" as a requirement to be met in order to mandate a consecutive sentence.

In addition, defendant argues that the evidence simply was insufficient to sustain a finding of severe bodily injury.  He notes that Bishop testified that he was shot twice in the chest but still drove to the hospital.  He also told the assistant State's Attorney that he was shot under the right arm and chest, although he denied that at the grand jury.  A police officer also testified that Bishop was in a great deal of pain, but he was only testifying to what he observed.  Ultimately, defendant claims, because there was no medical testimony or hospital records introduced indicating the severity of the wounds and because the courts have held that not every shooting with a gun results in "severe bodily injury" (
People v. Ruiz
, 312 Ill. App. 3d 49, 62 (2000); 
People v. Durham
, 303 Ill. App. 3d 763 (1999)), consecutive sentences were improper.

In the end, this decision is not ours to make.  Accordingly, we remand the case for resentencing and order the trial court to conduct an inquiry as to whether great bodily injury or severe bodily injury existed.  In addition, we note that the trial court never stated under which section, section 5-8-4(a) or section 5-8-4(b), it was proceeding and, more importantly, it never made a determination as to whether these acts were carried out in a single course of conduct.  Although it strains the imagination to think of these actions as being 
separate
 courses of conduct, that determination is also not ours to make.  See 
People v. Wilder
, 325 Ill. App. 3d 987, 1002 (2001).  Accordingly, in showing deference to the trial court's role as finder of fact, we remand for a single course of conduct determination 
and
 a great bodily harm vs. severe bodily injury inquiry.

For the foregoing reasons, we affirm the defendant's conviction and judgement.  As to whether consecutive sentences are proper, we vacate the trial court's imposition of consecutive sentences and remand for a determination:  (1) whether the defendant committed a Class X or Class 1 felony; (2) whether the defendant inflicted a severe bodily injury; and (3) whether that severe bodily injury was inflicted during the commission of 
any of the Class X or Class 1 felonies on the victim of those felonies. 

Affirmed in part, and vacated in part; cause remanded.

QUINN, J., specially concurs.

REID, J., concurs in part and dissents in part.

JUSTICE QUINN, specially concurring.

I concur in all of the holdings in the opinion except for the holding that Craig had standing to raise the issue of the alleged violation of Taylor and Bishop's fifth amendment rights.  This court has recently reaffirmed that "(t)he law is clear that a defendant has no standing to raise an alleged violation of a witness' fifth amendment rights.  
People v. Govea
, 299 Ill. App. 3d 76, 84 (1998); 
People v. Adams
, 283 Ill. App. 3d 520, 524 (1996).  This is because the constitutional privilege against self-incrimination is a personal privilege.  
Adams
, 283 Ill. App. 3d at 524."  
People v. DeSantis
, 319 Ill. App. 3d 795, 801-02 (2001).  This has long been the law in Illinois.  In 
Samuel v. People
, 164 Ill. 379 387 (1896), our supreme court held that where the privilege against self-incrimination has been improperly denied to a witness other than the accused, it cannot be raised on appeal because of the personal nature of the privilege.  

The Supreme Court has ruled similarly.  In 
Couch v. United States
, 409 U.S. 322, 329, 93 S. Ct. 611, 616, 34 L. Ed. 2d 548 (1973), they held:

"It is important to reiterate that the Fifth Amendment privilege

is a personal privilege: it adheres basically to the person, not to informa-

tion that may incriminate him.  As Mr. Justice Holmes put it: 'A party

is privileged from producing the evidence, but not from its production.'

Johnson v. United States
, 228 U.S. 457, 458, 33 S. Ct. 572, 57 L. Ed

919 (1913).  The Constitution explicitly prohibits compelling an accused 

to bear witness 'against himself ': it necessarily does not proscribe incrima-

ting statements elicited from another.  Compulsion upon the person

asserting it is an important element of the privilege, and 'prohibition

of compelling a man...to be witness against himself is a prohibition of

the use of physical or moral compulsion to extort communications from

him,' 
Holt v. United States
, 218 U.S. 245, 252-53, 31 S. Ct. 2, 6, 54

L. Ed. 1021 (1910).  It is extortion of information from the accused himself 

that offends our sense of justice.

       In the case before us the ingredient of personal compulsion 

against an accused is lacking."

In holding that Craig may assert the alleged violation of a witness' fifth amendment right not to testify, the majority opinion relies on the holding in 
Ohio v. Reiner
, 532 U.S. 17, 149 L. Ed. 2d 158, 121 S. Ct. 1252 (2001) and explains: "If Reiner had no standing to complain, there would be no need for the Supreme Court to rule the way it did; the Court simply could have disposed of the issue in a brief paragraph."  The explanation put forth by the Supreme Court in 
Reiner
 shows that this rationale is faulty.  After briefly discussing the Supreme Court's role in reviewing state court's decisions which rely upon the Supreme Court's precedents, the Court explained:

"We have held that the Fifth Amendment's privilege's protection

extends only to witnesses who have "reasonable cause to apprehend danger

from a direct answer."  
Hoffman v. United States
, 341 U.S. 479 at 486 , 71

S. Ct. 814.  That inquiry is for the court; the witness' assertion does not by 

itself establish the risk of incrimination.  
Ibid
.  A danger of "imaginary and 

unsubstantial character" will not suffice.  
Mason v. United States
, 244 U.S.

362, 366, 37 S. Ct. 621, 61 L. Ed. 1198 (1917).  But we have never held, 

as the Supreme Court of Ohio did, that the privilege is unavailable to those

who claim innocence.  To the contrary, we have emphasized that one of the 

Fifth Amendment's "basic functions...is to protect 
innocent
 men...'who other-

wise might be ensnared by ambiguous circumstances.' " 
Grunewald v. United 

States
, 353 U.S. 391, 421, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957)."  
Ohio v. 

Reiner
, 532 U.S. at 21, 121 S. Ct. at 1254.  

The above language explains that the Ohio Supreme Court had disregarded well-settled constitutional principles in reaching their decision in 
State v. Reiner
, 89 Ohio St. 3d 342, 751 N.E. 2d 662 (2000).  As this was a decision by a state supreme court which would have an enormous impact on (at a minimum) every court in Ohio, the Supreme Court reviewed the holding and reversed.  If the Supreme Court had decided the case on the standing issue, it would  not have been able to reach the really important issue - reiterating that the privileges of the fifth amendment are available to "those who claim innocence."  If the Supreme Court had wished to reverse the sound constitutional principle propounded in 
Couch v. United States
, the court would have said so.  This court should not "assume" otherwise.

This is not to say that a trial court's ruling regarding a witness' exercise of their fifth amendment right against self-incrimination is never reviewable on appeal.  A defendant has standing to assert that the trial court erred in ruling on a witness' invocation of the fifth amendment when that invocation impacts on the statutory requirements imposed under sections 115-10.1 and 115-10.2 of the Code of Criminal Procedure (725 ILCS 5/115-10.1, 10.2 (West 2000)).  See 
People v. Redd
, 135 Ill. 2d 252 (1990) reversing the decision of a trial court which allowed the State to use a witness' grand jury testimony as substantive evidence at trial pursuant to section 115-10.1, where that witness invoked his fifth amendment rights in refusing to answer almost all questions on direct or cross-examination; also see 
People v. Quick
, 308 Ill. App. 3d 474 (1999) and 
People v. Brown
, 303 Ill. App. 3d 949 (1999) where witnesses invoked their fifth amendment rights and the trial courts allowed the witness' prior statements to be used as substantive evidence at trial pursuant to section 115-10.2

  When a trial court finds that a defense witness may properly exercise his fifth amendment rights and thus excludes that witness' testimony, the defendant may appeal that decision by asserting that it violated his Sixth Amendment right to obtain witnesses in his favor.  See 
People v. Loya
, 90 Ill. App. 3d 1078, 1087 (1980).   Similarly, when a witness testifies in a prior proceeding in a manner which is helpful to a defendant but invokes his fifth amendment rights at trial, the trial court's decision whether to admit the earlier testimony as a statement against penal interest is reviewable.  See 
People v. Rice
, 166 Ill. 2d 35, 38 (1995) - affirming the trial court and reversing the appellate court's holding that the prior testimony should have been admitted as a statement against penal interest.  Also see 
People v. Taylor
, 287 Ill. App. 3d 800, 810 (1997) - holding that a witness' prior testimony was admissible under the former-testimony and statement-against-interest hearsay exceptions.

Finally, a trial court's decision overruling a witness' exercise of his fifth amendment rights is reviewable when that witness is convicted of contempt for refusing to answer questions in spite of the trial court's order.  See 
People v. Dmitrlyer
, 302 Ill. App. 3d 814 (1998); 
People v. McNeal
, 301 Ill. App. 3d 889 (1998); 
People v. Cooper
, 202 Ill. App. 3d 336 (1990).

In 
People v. Gossitt
, 259 Ill. App. 3d 825 (1994) and 
People v. Cassell
, 283 Ill. App. 3d 112 (1996), the court addressed the defendant's claim on appeal that the trial court erred in finding that witnesses did not have a valid fifth amendment right not to testify.  While both opinions rejected the defendant's arguments, they did so substantively and neither addressed the issue of whether the defendant had standing.  No reported case in Illinois has held that a defendant has standing to raise on appeal an alleged violation of a witness' fifth amendment rights under the circumstances present here.  For these reasons, I dissent as to this holding while I concur in all other aspects of this opinion.

While a defendant does not have standing to raise an alleged violation of a witness' fifth amendment rights on appeal, our trial courts still have a duty to see that any witness who properly invokes his right against self-incrimination has that right protected.  See 
People v. Redd
, 135 Ill. 2d at 305-06.  Indeed, the trial court has the discretion to inform a witness of his fifth amendment privilege against self-incrimination, particularly when the witness appears in court unrepresented.  
People v. Radovick
, 275 Ill. App. 3d 809, 815 (1995).  In doing so, the court must be careful to not appear to threaten the witness, impairing the defendant's due process right to present witnesses in his defense.  Illinois Evidence Manual 3d Ed. (1995), Justice Robert Steigmann, §20:0 p. 67-68 2001 
supplement
.  (Lawyers Cooperative Publishing).     

JUSTICE REID, concurring in part and dissenting in part.

Although I concur in the holdings that (1) this cause, at least, should be remanded for the trial court to resentence the defendant, and (2) the defendant has standing under the circumstances of this case to raise the issue on appeal that arises out of the alleged violation of Bishop and Taylor's fifth amendment rights, I dissent as to the holding that affirms the conviction.  I would reverse and remand for a new trial.

As to the issue of standing, I would like to make some observations to supplement those expressed in the majority opinion.  While I do not feel that our reliance on the holding in 
Ohio v. Reiner
, 532 U.S. 17, 149 L. Ed. 2d 158, 121 S. Ct. 1252 (2001) is misplaced, I take the position that we need not reach the argument that 
Reiner
 has changed the law on standing.  In 
People v. Redd
, 135 Ill. 2d 252 (1990), our supreme court addressed a situation where the State called a witness (Mr. Bea) who invoked his fifth amendment rights in refusing to answer almost any questions by the State on direct exam.  The trial court then allowed the State to ask the witness whether he was asked certain questions and gave certain answers before the grand jury.  The defense was allowed to ask numerous questions regarding purported recantations made by the witness.  Again, to almost all of these questions on direct and cross, the witness invoked his fifth amendment rights.  The trial court allowed the jury to treat the witness' grand jury testimony as substantive evidence pursuant to Section 115-10.1 of the Code of Criminal Procedure (725 ILCS 5/115-10.1), based on the court's finding that the witness' answers were inconsistent with his grand jury testimony.  Our supreme court reversed, holding that a witness in a criminal case has the privilege to refuse to answer questions which tend to incriminate him, but that the protection secured by the fifth amendment is confined to where the witness has reasonable cause to believe he might subject himself to prosecution if he answers.  
Redd
 at 304, citing 
Mason v.United States
, 244 U.S. 362, 61 L. Ed 1198, 37 S. Ct. 621(1917); 
People v. Baker
, 123 Ill. 2d 233, 243-44 (1988); 
People v. Katsigiannis
, 171 Ill. App. 3d 1090, 1101 (1988); 
People v. Thornton
, 120 Ill. App. 3d 983, 986 (1983); 
People v. McLaren
, 77 Ill. App. 3d 368, 373 (1979).  The court went on to hold that the privilege does not exist where there are no reasonable grounds to fear self-incrimination.  Then the court held that there was nothing in the record before it to indicate that Mr. Bea did or did not have reasonable grounds to fear incriminating himself if he were to answer the questions put to him.  (The trial court allegedly only had an off the record discussion with counsel.)  The court went on to hold that the assertion of the fifth amendment privilege cannot be equated to a lapse of memory for the purposes of section 115-10.1; that the requirement that there be an opportunity to cross examine the witness would not be met; and that the State has the option of extending immunity to the witness which would moot the issue of privilege.  
Redd
 at 308-09, 314.

While 
Redd
 involved an interpretation of a statute, section 115-10.1, the court gave clear directions that "once a witness asserts his fifth amendment privilege not to incriminate himself, the 'it is for the circuit court to determine if under the particular facts there is a real danger of incrimination.'" 
Redd
, 135 Ill. 2d at 304.  The applicability of this language is not confined to cases involving section 115-10.1 evidence.  In any event, the case, 
sub judice, 
does involve section 115-10.1 evidence and we find 
Redd
 to be controlling.

It is likewise clear that the court below did not hold a meaningful hearing to determine if the two witnesses before it had reasonable grounds to invoke their fifth amendment privilege not to testify.  The trial court based its decision on an erroneous belief that the witnesses had waived the privilege by testifying before the grand jury.  This was error.  The trial court in holding such a hearing must do so in such a way that witnesses who seek to invoke their right not to testify are subjected to a factual hearing on the reasonableness of their fear of self-incrimination.  The evidence to support the claim of privilege should be viewed in the light most favorable to the witness.  
Hoffman v. United States
, 341 U.S. 479, 486-87, 95 L. Ed. 1118, 1124, 71 S. Ct. 814, 818 (1951).   The court should also give special attention to unrepresented witnesses, using care not to impair the rights of the parties.

The interesting thing about this case is that it does not involve buddies trying to help the defendant by claiming the fifth.  It involves shooting victims that were members of a rival gang who came into court with a police report hanging over their heads that could be the basis for a belief that they too could be charged with a crime.  Also, it is clear that the State did not offer to immunize these two witnesses.  Because this was a close case based, in the main, on the conflicting testimony of Bishop and Taylor I would reverse and remand this case for a new trial.         

  

FOOTNOTES
1:    In his motion for leave to supplement the record and file a supplemental brief, the defendant states that appellate counsel assumed the trial court had properly applied that statute concerning consecutive sentences.  When the State then sought to have the mittimus changed, the defendant claims that he "learned for the first time that the court misapplied the statute concerning consecutive sentences and wrongfully sentenced the appellant to consecutive sentences."  In any event, this court granted the defendant's motion.